**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00013-RMR-STV

ANDREW GARLICK,
DR. THOMAS FOW, and
REBEKAH VOELKELT,

      Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO,
TODD SALIMAN, in his official capacity as President of University of Colorado,
DONALD M. ELLIMAN, JR., in his official capacity as Chancellor of University of Colorado
Anschutz Medical Campus, and
MICHELLE MARKS, in her official capacity as Chancellor of University of Colorado Denver,

      Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (ECF NO. 30)**

---

      Defendants, The Regents of the University of Colorado, Todd Saliman, Donald M.

Elliman, Jr., and Michelle Marks, in their official capacities (collectively, the "University"),

through undersigned counsel, submit this Response to Plaintiffs' Motion for Preliminary

Injunction (ECF No. 30).

## BACKGROUND

      Plaintiffs seek to enjoin the University of Colorado from enforcing its COVID-19

vaccination policies. Undergraduate students Andrew Garlick and Rebekah Voelkelt challenge

the University of Colorado Denver Administrative Policy 3006 ("UCD Policy"), in effect at the

Denver campus, even though Mr. Garlick already received a religious exemption, and Ms.

Voelkelt voluntarily dropped her classes and never requested an exemption. Graduate student Dr.

Thomas Fow is a licensed dentist and periodontal student at the Anschutz Medical Campus. He

was denied a religious exemption under the Initial Anschutz Policy 3012, amended months

before this case was filed, and is ineligible for a religious exemption under the Amended

Anschutz Policy presently in effect. Plaintiffs argue the University's vaccine mandates violate

their substantive due process, First Amendment, and equal protection rights. Because the policies

do not violate these rights, the requested relief must be denied.

### I.    COVID-19

COVID-19 is a potentially deadly infectious disease caused by SARS-CoV-2, the novel

coronavirus, that primarily spreads through respiratory droplets and very small particles

containing the virus.[1] There have been over 67.9 million COVID-19 cases in the United States.

*See* Ex. A, Decl. of Dean Samet, ¶26; Ex. M, CDC Chart of Cumulative Cases. Nationwide more

than 853,230 people have died from COVID-19.[2] *See* Ex. A, ¶26; Ex. N, CDC Chart of

Cumulative Deaths. The number of COVID-19 deaths in this country surpasses the total

population of four of the fifty states — Wyoming (581,075), Vermont (623,251), Alaska

(724,357), North Dakota (770,026) — and that of the District of Columbia (714,153).[3] This loss

of human life exceeds the entire population of the City and County of Denver (715,522).[4] In

Colorado, there have been more than 1,147,740 cases, 53,978 hospitalizations, and 11,087 deaths

due to COVID-19.[5] Ex. A, ¶27; Ex. P, ¶27, Decl. of Dr. Campbell. Twenty-seven counties have

---

[1] Ex. A, Decl. of Dean Samet, ¶¶20-22; https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. A court may take judicial notice of a fact not subject to reasonable dispute because it can be readily determined from sources whose accuracy cannot reasonably be questioned. *See* F.R.E. 201(b); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

[2] https://covid.cdc.gov/covid-data-tracker/#datatracker-home, last visited Jan. 19, 2022.

[3] https://worldpopulationreview.com/states, last visited Jan. 6, 2022.

[4] https://www.census.gov/quickfacts/denvercountycolorado, last visited Jan. 6, 2022.

[5] https://covid19.colorado.gov/data, last visited Jan. 19, 2022.

fewer residents than the number of Coloradoans who have died due to COVID-19; fifty have

fewer residents that the number of Coloradoans who have been hospitalized.[6]

People of all ages can contract and transmit COVID-19, and those who contract the

disease may suffer severe illness or death, or incur long-term, ongoing health problems.[7] Ex. A,

¶23. Anyone who contracts COVID-19, including children and young people, can transmit the

disease to others.[8] Id. at ¶24. Persons with certain medical conditions, such as cancer, kidney,

liver, and lung disease (including moderate to severe asthma), heart conditions, diabetes, those

who are pregnant, and the immunocompromised, among others, are at a heightened risk of severe

illness or death from COVID-19.[9] Id. at ¶25.

Due to widespread infections, the SARS-CoV-2 virus mutated into the Delta and Omicron

variants, which are respectively far deadlier and significantly more transmissible than prior

variants.[10] See Ex. A, ¶¶ 18-19, 21, 59; Ex. P, ¶, 80. From June through mid-December 2021, the

Delta variant predominated in Colorado. Ex. A, ¶18. Over the past month, Omicron has begun to

outpace Delta for weekly proportion of variants of concern by specimen, causing a new

explosive wave of COVID-19 in Colorado.[11] Id. at ¶59. New and potentially deadlier variants

---

[6] https://data.colorado.gov/Human-Services/Map-of-Colorado-Population-by-County-Boundary/8cjt-8pn2, last visited Jan. 6, 2022.

[7] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html, last visited Jan. 19, 2022.

[8] See https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html, last visited Jan. 19, 2022.

[9] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, last visited Jan. 19, 2022.

[10] https://coloradosph.cuanschutz.edu/docs/librariesprovider151/default-document-library/the-current-state-of-covid_20211103.pdf?sfvrsn=4e83ddba_0, p. 19 (discussing increased deaths).

[11] https://covid19.colorado.gov/data, last visited Jan. 6, 2022;
https://coloradosph.cuanschutz.edu/news-and-events/newsroom/covid-19-news/public-health-main-site-news/colorado-covid-19-modeling-group-releases-statement-as-omicron-surges, last visited Jan. 12, 2022.

will continue to mutate until there is "a level of immunity in the population at which the epidemic can no longer propagate." *Id*. at ¶¶61; *see also id*. at ¶53 (Delta); *id.* at ¶¶33-34 (Omicron); *id.* at ¶58 ("Vaccination is the essential means by which to mitigate the spread … and to assure that … replication of the virus … driven by the non-vaccinated does not lead to further mutations …."); Ex. P, ¶¶ 71-73.

## II.    COVID-19 in Colorado

The situation in Colorado is critical. Not only is the pandemic far from over, in September 2021, the pandemic began an upward turn and modeling projections showed increasing numbers of infections, hospitalizations, and deaths. Ex. A, ¶28. At that time, experts predicted that "approximately 1 in every 99 Coloradoans were infectious, which was in the upper range of prevalence rates of infection in 2021." *Id.* at ¶18. By December 2021, experts estimated that one in every forty Coloradans were infectious. *Id.* at ¶19.

On October 31, 2021, Governor Jared Polis signed Executive Order D 2021 135 authorizing the Colorado Department of Public Health and Environment ("CDPHE") to order hospitals to transfer or cease admission of patients to respond to the growing COVID-19 disaster.[12] *Id.* at ¶29. Hospitalizations continued to increase, and the number of available hospital beds correspondingly decreased, prompting Governor Polis to amend and extend Executive Order D 2021 135 on November 29th.[13] *Id.* at ¶¶30-32; Executive Order D 2021 138. By Thanksgiving week, 93% of acute care and 94% of ICU hospital beds in Colorado were in use.[14] Ex. A, ¶32. Colorado anticipated the tenth highest hospital demand nationwide. *Id.* at ¶31. As of

---

[12] *See* https://drive.google.com/file/d/1iUxoynYjvUdRu00suieFdmecHoBPLEOb/view, last visited Jan. 19, 2022.

[13] *See* https://drive.google.com/file/d/1iUxoynYjvUdRu00suieFdmecHoBPLEOb/view, last visited Jan. 19, 2022.

[14] https://covid19.colorado.gov/data, last visited Jan. 6, 2022.

January 16, 2022, the seven-day average occupancy rate for acute care and ICU hospital beds in Colorado is 93% and 92%, respectively.[15] Colorado is girding for post-holiday COVID-19 hospitalizations — already up 30% — to exceed the November peak.[16] Fifty-three percent of Colorado hospital patient care facilities anticipate staff shortages within the next week due to the virus's rampant spread.[17]

### III.    COVID-19 in College Students

The University's vaccination policies are tailored congruent with academic medical research, as well as trends particular to Colorado. In-person instruction at colleges and universities is associated with increased COVID-19 incidence levels and percentage of test positivity.[18] Ex. A, ¶76. One study showed a 56% increase in incidence of COVID-19 and a 30% increase in hotspot occurrence in counties with universities within three weeks of their resumption of in-person instruction. *Id.* at ¶77. Another study found that 57.4% of laboratory confirmed COVID-19 cases in persons 0-24 years reported in the United States over a nine-month period in 2021 occurred among young adults aged 18-24.[19] *Id*. at ¶78. Presently, the

---

[15] https://covid19.colorado.gov/data, Percent of Beds in Use, Last visited Jan. 19, 2022; New Hospital Admissions by Week of Admission, last visited Jan. 12, 2022 (2,091 people admitted the week of Jan. 2, up 32% from the prior week); https://www.denverpost.com/2022/01/05/colorado-omicron-hospitalizations/, last visited Jan. 12, 2022.

[16] https://covid19.colorado.gov/data, last visited Jan. 16, 2022.

[17] https://covid19.colorado.gov/data, Hospital Leel, last visited Jan. 19, 2022.

[18] Leidner AJ, Barry V, Bowen VB, Silver R, Musial T, Kang GJ, Ritchey MD, Fletcher K, Barrios L, Pevzner E. Opening of Large Institutions of Higher Education and County-Level COVID-19 Incidence - United States, July 6-September 17, 2020. MMWR Morb Mortal Wkly Rep. 2021 Jan 8;70(1):14-19. doi: 10.15585/mmwr.mm7001a4. PMID: 33411699; PMCID: PMC7790156.

[19] Leidman E, Duca LM, Omura JD, Proia K, Stephens JW, Sauber-Schatz EK. COVID-19 Trends Among Persons Aged 0–24 Years — United States, March 1–December 12, 2020. MMWR Morb Mortal Wkly Rep 2021; 70:88–94. DOI: http://dx.doi.org/10.15585/mmwr.mm7003e1external icon; *and see* https://www.cdc.gov/mmwr/volumes/70/wr/mm7003e1.htm, last visited Jan. 10, 2022.

prevalence of COVID-19 amongst the typical college-aged demographic in Colorado far exceeds the same group's representation amongst the population.[20] *Id.* at ¶79. Indeed, while children aged 10-19 make up 13% of the population with a near corresponding 12.52% of COVID-19 cases, young adults aged 20-29 make up a mere 14.66% of Colorado's population but represent 20.62% of COVID-19 cases — the largest percentage of cases amongst *any* age group.[21] *Id.* at 80. Those who tend to be most ill in our ICUs are those who are not vaccinated, a group that is trending younger than it was earlier in the pandemic. Ex. T, ¶20, Decl. of Dr. Herlihy.

## IV.    COVID Vaccines

Vaccination is the best tool available to slow the spread of COVID-19 and to protect the public at large. Ex. A, ¶62; *id.* at ¶82 (Vaccination is "the path to safeguard the University's employees, students, and patients to the fullest extent possible."); Ex. D, Decl. of Dr. Dominguez, ¶9. Vaccination and masking "are the two most important tools Coloradans can use to prevent the spread of COVID-19 and bring us closer to ending the pandemic."[22] Ex. D, ¶¶9-10. There is *no* safer nor more effective means. Ex. A, ¶62; Ex. D, ¶12; Ex. J, ¶19, Decl. of Dr. Wynia; Ex. P. ¶86. A study released January 19, 2022, likewise concluded "vaccination remains the safest and primary strategy … [and] provides the most robust protection against initial infection, severe illness, hospitalization, long-term sequelae, and death."[23]

---

[20] https://covid19.colorado.gov/data, last visited Jan. 6, 2022.

[21] https://covid19.colorado.gov/data, last visited Jan. 6, 2022.

[22] https://covid19.colorado.gov/mask-guidance, last visited Jan. 6, 2022; https://www.auroragov.org/residents/public_safety/office_of_emergency_management/covid-19_coronavirus_resources, last visited Jan. 6, 2022.

[23] León TM, Dorabawila V, Nelson L, et al. COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021. MMWR Morb. Mortal Wkly. Rep. ePub: 19 January 2022. DOI: http://dx.doi.org/10.15585/mmwr.mm7104e1.

Three free COVID-19 vaccinations are available to Coloradoans: Pfizer BioNTech mRNA, Moderna mRNA, and Johnson/Janssen ("J&J") viral vector vaccine (together referred to as "COVID Vaccines").[24] Ex. A, ¶44. The Pfizer BioNTech mRNA vaccine, which is approved for those ages five and older, has full approval from the U.S. Food and Drug Administration ("FDA"). *Id*. at ¶¶45-46. The FDA gave the Moderna mRNA and J&J vaccines, which are approved for those ages twelve and older, approval through Emergency Use Authorization ("EUA"), which is used during public health emergencies.[25] *Id.* at ¶44. Children under the age of five are ineligible for vaccination. *Id*. at ¶48. The CDC recommends everyone over the age of five take the COVID Vaccines, which have "brought about the possibility of bringing the … pandemic under control." Ex. A, ¶¶40, 49.

### A. The COVID Vaccines are vaccines, not medical treatment.

Different types of vaccines work in different ways to afford protection.[26] Ex. P, ¶34. All types of vaccines leave the body with a supply of "memory" T-lymphocytes as well as B-lymphocytes that will remember how to fight the virus in the future. *Id*. The Pfizer-BioNTech and Moderna vaccines are messenger RNA ("mRNA") vaccines, which trigger an immune response inside the body.[27] *Id*. at ¶37. Some vaccines, like the flu or measles vaccinations, introduce a small piece of virus into the body, which causes the body to produce antibodies to protect against future infection. *Id.* at ¶36. The mRNA COVID Vaccines do not contain live

---

[24] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html, *last visited* Oct. 12, 2021.

[25] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html, *last visited* Oct. 12, 2021.

[26] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/how-they-work.html, last visited Jan. 7, 2022.

[27] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html, Myth: The mRNA vaccine is not considered a vaccine, last visited Jan. 7, 2022; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mRNA.html, last visited Jan. 7, 2022.

virus, but they likewise prompt the body to produce antibodies to protect against future infections.[28] *Id.* at ¶37. They do this by teaching cells to create a harmless piece of a "spike protein" like that on the virus's surface that causes COVID-19. *Id.* The immune system learns it does not belong there and responds to remove it. *Id.* This immune system response causes the production of antibodies. *Id.* Unlike medical treatment, which is administered *after* a person has contracted a virus or disease, vaccines, including the COVID Vaccines, are administered before a person becomes ill. *Id.* at ¶56. That the COVID Vaccines lessen or prevent symptoms upon infection does not transform them into therapeutic medical treatment. *Id.* at ¶¶56-57; *see also* Ex. J, ¶14.

### B.  The COVID Vaccines are effective.

The COVID Vaccines are effective.[29] Ex. A, ¶¶40, 54; Ex. P, ¶¶13, 62. Before the FDA determines whether to approve a vaccine, clinical trials are conducted to determine safety and efficacy.[30] Ex. P, ¶¶9-10, 41, 61. After an EAU approval, the FDA continues to study an authorized vaccine to determine its efficacy under real-world conditions. *Id.* at ¶¶20, 62. Research into the COVID Vaccines' efficacy shows vaccinated people are less likely to be infected or to transmit the virus to others, and the chances of hospitalization or death from contracting the virus substantially decrease.[31] Ex. A, ¶49; Ex. P, ¶¶13-20. A study recently published in the New England Journal of Medicine concluded the COVID Vaccines are "highly effective" based on findings that the mRNA COVID Vaccines were 89% effective against

---

[28] https://www.cdc.gov/coronavirus/2019-ncov/downloads/vaccines/COVID-19-mRNA-infographic_G_508.pdf, last visited Jan. 19, 2022, and attached as Exhibit AA.

[29] https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness, last visited Jan. 7, 2022.

[30] https://www.cdc.gov/vaccines/covid-19/effectiveness-research/protocols.html, last visited Jan. 7, 2022.

[31] *See* https://covid19.colorado.gov/vaccine-breakthrough, *last visited* Oct. 12, 2021.

infection leading to hospitalization, 90% effective against infection leading to an ICU admission, and 91% effective against infection leading to an emergency room or urgent care clinic visit.[32] *Id*. at ¶44. Indeed, the CDC's COVID Data Tracker shows that while the rate of COVID-19 associated hospitalizations for unvaccinated persons in the 18-49 years age group climbed to 23.4 per 100,000 population at the end of November 2021, the rate for the same age group who took the vaccine was a mere 0.8.[33] *Id*. at ¶55.

The COVID Vaccines protect against more severe symptoms for those infected with the Omicron Variant, although thus far they have been less effective against preventing "breakthrough" infections.[34] Ex. A, ¶¶65-66; Ex. P, ¶¶13-20. That breakthrough infections can sometimes occur, does not mean the COVID Vaccines are ineffective, have become mere treatment, or should be abandoned.[35] Ex. A, ¶67; Ex. J, ¶14; Ex. P, ¶¶56, 86. Vaccines are rarely 100% effective in preventing viral infection. Ex. A, ¶68; Ex. P, ¶¶58-59. However, as the number of fully vaccinated persons increases, the number of breakthrough infections should decrease. Ex. A, ¶69; Ex. P. ¶¶64-65. Vaccination remains the only safe means of mitigating the spread and further mutations of the SARS-CoV-2 virus to achieve maximum immunity and to end the worldwide pandemic that has been ravaging Colorado for nearly twenty-three months.

---

[32] *See* Thompson MG, Stenehjem E, Grannis S, et al. Effectiveness of Covid-19 vaccines in ambulatory and inpatient care settings. N Engl J Med 2021; 385:1355-1271.

[33] https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination, last visited Jan. 7, 2022.

[34] https://coloradosph.cuanschutz.edu/news-and-events/newsroom/deans-notes/public-health-main-site-news/the-covid-19-pandemic-omicron-clobbers-colorado-and-tragic-wildfires-in-boulder-county, last visited Jan. 12, 2022; https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1045619/Technical-Briefing-31-Dec-2021-Omicron_severity_update.pdf, last visited Jan. 12, 2022.

[35] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html, last visited Jan. 7, 2022.

Ex. A, ¶¶58, 82; Ex. D, ¶11; Ex. J, ¶¶11, 18-19; Ex. K, Decl. of Dr. Zimmer, ¶17; Ex. P, ¶¶13, 20, 65, 79, 82. No other available intervention has an effectiveness level approaching that of vaccination. Ex. A, ¶¶38-40; Ex. D, ¶¶7-9. At bottom, vaccination is the most effective means of protecting the most vulnerable — children, the elderly, and the immunocompromised — including the patients present on the Anschutz Medical Campus where Dr. Fow studies. Ex. D ¶¶9, 12; Ex. G ¶¶15-16, Decl. of Dr. Jackson; Ex. K, ¶¶11-15.

"[T]here is no alternative to vaccination" in pursuit of the goal of "safe classrooms, offices, laboratories, and clinics and hospitals." Ex. A, ¶83. The mere use of PPE will not end the pandemic. Ex. D, ¶10; Ex. J, ¶10. While nonpharmaceutical interventions can be layered to reduce transmission, none — save vaccination — have any impact on reducing COVID-19's severity. Ex. A, ¶57. More than 71% of those who are hospitalized due to COVID-19 are unvaccinated.[36] *Id.* at ¶56.

### C.  The COVID-19 Vaccines are safe.

The COVID Vaccines have proven safe, with over 526 million doses administered in the United States.[37] *Id.* at ¶52; Ex. P, 50; Ex. O, CDC Chart. While mRNA vaccines are new to the public, they have been scientifically studied for decades and they are held to the same rigorous safety and effectiveness standards as other types of vaccines in the United States.[38] Ex. P, ¶38.

---

[36] This high percentage, coupled with the inability to vaccinate children under age five, means that vaccination rate attained by students in the hospital and medical care settings is reduced by introduction of patient and visitor populations. Likewise, the Denver Campus is a public place where members of the public intermingle with University employees and students, thereby diluting the overall vaccination rate amongst all persons present on any given day.
[37] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html, last visited Jan. 7, 2022; https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total, last visited Jan. 7, 2022.
[38] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/mRNA.html, last visited Jan. 7, 2022.

Prior to being made available to the general public, the COVID Vaccines were evaluated in clinical trials with tens of thousands of participants. *Id.* at ¶41. Each of the three COVID Vaccines met the FDA's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support authorization.[39] *Id*. at ¶42.

The medical community tracks adverse events from the COVID Vaccines in a nationwide database known as the Vaccine Adverse Event Reporting System ("VAERS").[40] *Id*. at ¶44. While VAERS is useful for monitoring vaccine safety, as the federal Department of Health and Human Services ("DHHS") makes plain, VAERS alone cannot determine if a vaccination caused any given adverse event. *Id.* Therefore, while Plaintiffs note that "adverse events" have been reported after some people were vaccinated, that raw data does not mean the COVID Vaccines caused the events, simply because the former preceded the latter in time.[41] *Id.* at ¶45; Ex. A, ¶53.

---

[39] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html, last visited Jan. 7, 2022.

[40] https://vaers.hhs.gov/data.html, last visited Jan. 10, 2022 ("VAERS reports alone cannot be used to determine if a vaccine causes or contributed to an adverse event or illness. The reports may contain incomplete, inaccurate, coincidental, or unverifiable information. In large part, reports to VAERS are voluntary, which means they are subject to biases.").

[41] The "scientific data" put forth by Plaintiffs' declarants about unproven treatments, which overstate the benefits of natural immunity, and inaccurately recite the risks related to myocarditis is controverted by numerous sources. *See generally* Ex. A; Ex. P. The Court in *Klaassen v. Trustees of Indiana Univ.*, No. 1:21-CV-238 DRL, 2021 WL 3073926, *7 (D. Ind. July 18, 2021) (*Klaassen I*), rejected nearly identical attestations by Dr. McCullough, stating his opinion "isn't stated to any reasonable degree of medical certainty." *Id.* The *Klaassen I* court also specifically credited Indiana University's medical experts over Dr. McCullough given their "firsthand knowledge of [the] University's specific circumstances." *Id.* at *28. The court wrote that Dr. McCullough's testimony about myocarditis "reveal[ed] a true failing" and did not set forth "a causative link between any vaccine and myocarditis." *Id.* at *31. Thus, the court gave Dr. McCullough's testimony "little weight." *Id.* The court further rejected Dr. McCullough's opinion that so-called herd immunity had been attained. *Id.* at *37.
A Texas court recently granted Dr. McCullough's former employer a restraining order after he allegedly falsely represented his employment status and affiliations. *See* Compl. ¶¶13-14 https://courtsportal.dallascounty.org/DALLASPROD/DocumentViewer/Embedded/eULj9qgvW dYNRScaJid2nU04a95TheIkJoLEqXoyQGq_wWKJ2jG9Pokic2iGm5HJ-sVaQXZ38Spf093BsZt7qA2?p=0.

*The COVID Vaccines do not cause infertility.* The COVID Vaccines have been shown neither to correlate with nor cause infertility.[42] Ex. P, ¶51. A recent study reported by the National Library of Medicine concluded that reports claiming that COVID Vaccines cause female sterility are "unfounded." *Id.* People have become pregnant after taking the COVID Vaccines,[43] and pregnant women are more likely to become severely ill with COVID-19 compared with women who are not pregnant. *Id.* As such, the CDC recommends those who are trying to get pregnant or might wish to become pregnant in the future, and their partners, get a COVID Vaccine.[44] *Id.*

*The risk of heart issues from COVID infection is greater than that from vaccination.* It is true some experts are studying a temporal correlation between the mRNA COVID Vaccines and myocarditis (heart muscle inflammation), in young men. Ex. P, ¶52. Any risk of myocarditis appears to be exceptionally small. *Id.* One study suggested the risk of myocarditis is around eight in one million with another study suggesting the risk is around twenty in one million.[45] *Id.* Comparatively, the Smallpox vaccine had a suspect case observed rate of myocarditis and pericarditis 5.7 per 1,000 primary doses. *Id.* at ¶84. There is no increased risk for the J&J COVID Vaccine. *Id.* at ¶52. The CDC continues to recommend that, despite the incredibly small

---

[42] *See* Morris RS. SARS-CoV-2 spike protein seropositivity from vaccination or infection does not cause sterility. F S Rep. 2021 Sep;2(3):253-255. doi: 10.1016/j.xfre.2021.05.010. Epub 2021 Jun 2. PMID: 34095871; PMCID: PMC8169568.

[43] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/planning-for-pregnancy.html, last visited Jan. 7, 2022.

[44] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/planning-for-pregnancy.html, last visited Jan. 7, 2022; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/pregnancy.html, last visited Jan. 14, 2022.

[45] *See* Han W. Kim *et al., Patients with Acute Myocarditis Following mRNA COVID-19 Vaccination*, JAMA Cardiol (June 29, 2021), https://jamanetwork.com/journals/jamacardiology/fullarticle/2781602; Israeli Ministry of Health, *Surveillance of Myocarditis (Inflammation of the Heart Muscle) Cases Between December 2020 and May 2021* (Feb. 6, 2021), https://www.gov.il/en/departments/news/01062021-03.

potential risk, people who are eligible should still take the COVID Vaccines.[46] Ex. P, ¶52. Most recently, another study found a "greater risk of myocarditis, pericarditis, and cardiac arrhythmia following SARS-CoV-2 infection" than following vaccination.[47] *Id.* Thus, there is a greater reported incidence of myocarditis after infection with COVID-19, than for vaccination. *Id.*

### D.  Prior infection is not an adequate substitute for the COVID Vaccines.

The COVID Vaccines are a safer, more dependable way to build immunity than becoming infected with COVID-19.[48] Ex. A, ¶82. While people can develop immunity through prior infection, "natural immunity" wanes, and its protections do not endure.[49] *Id.* at ¶62; Ex. P, ¶67. One study showed those previously infected with COVID-19 remain more than twice as likely to become reinfected than those who become fully vaccinated after their recovery.[50] Achieving the highest vaccination rate possible among students, especially for Anschutz Medical Campus dental students like Dr. Fow, is critical to patient and community safety at the University, as well as Adams and Denver Counties and Colorado. Ex. A, ¶83; Ex. B, ¶8, Decl. of Carolyn Brownawell.

---

[46] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html, last visited Jan. 10, 2022.

[47] Patone, M., Mei, X.W., Handunnetthi, L. *et al.* Risks of myocarditis, pericarditis, and cardiac arrhythmias associated with COVID-19 vaccination or SARS-CoV-2 infection. *Nat Med* (2021). https://doi.org/10.1038/s41591-021-01630-0 ("We estimated extra myocarditis events to be between 1 and 10 per million persons in the month following vaccination, which was substantially lower than the 40 extra events per million persons observed following SARS-CoV-2 infection.").

[48] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html, Myth: The natural immunity I get from being sick … is better than … from the .... vaccination, last visited Jan. 7, 2022.

[49] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html, Myth: The natural immunity I get from being sick … is better than … from the .... vaccination, last visited Jan. 7, 2022.

[50] *See* Cavanaugh AM, Spicer KB, Thoroughman D, Glick C, Winter K. Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021. MMWR Morb Mortal Wkly Rep 2021; 70:1081-1083. DOI: http://dx.doi.org/10.15585/mmwr.mm7032e1external icon.

## V.       Other Public Health Measures: Masking and Testing

Masking — particularly for unvaccinated persons — is a vital, layered public health measure to help mitigate the spread of COVID-19 on the University's Denver and Anschutz Medical Campuses. The CDC recommends using masks to prevent transmitting COVID-19 since they "reduce the emission of virus-laden droplets by the wearer ('source control')" *and* "help reduce inhalation of … droplets by the wearer ('filtration for wearer protection')."[51] The CDPHE recommends wearing a mask around others even for those who are vaccinated.[52] Ex. T, ¶31. The Department of Education released a fifty-seven-page handbook directed towards the safe operation of postsecondary education institutions during the ongoing COVID-19 pandemic.[53] Ex. A, ¶73. Using masks consistently and correctly in collegiate educational settings where everyone is not vaccinated is a primary requirement of that operational guidance, which advises institutions with mixed populations to "consider requiring mask use by all people present on campus."[54] *Id*. at ¶74. This recommendation is predicated upon research showing that mask mandates are effective, with the handbook citing to one study that showed a 5.6% decrease in COVID-19 hospitalizations of individuals between 18 and 64 years old. *Id*.

Masking is *necessary* in medical settings, including the Anschutz Medical Campus. Ex. U, ¶¶29-36. Decl. of Dr. Kassebaum. The American Hospital Association confirmed with the CDC that *all* persons in healthcare facilities should mask.[55] Ex. A, ¶75. The CDPHE's Sixth

---

[51] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fmore%2Fmasking-science-sars-cov2.html, last visited Jan. 19, 2022.

[52] https://covid19.colorado.gov/mask-guidance, last visited Jan. 16, 2022.

[53] https://www2.ed.gov/documents/coronavirus/reopening-3.pdf, last visited Jan. 10, 2022.

[54] https://www2.ed.gov/documents/coronavirus/reopening-3.pdf at p. 12.

[55] https://www.aha.org/news/headline/2021-05-17-cdc-masks-still-required-health-care-settings, last visited Jan. 10, 2022. The CDPHE is evaluating the recently updated CDC recommendations around the type of facial covering recommended. Ex. T, ¶ 30.

Amended Public Health Order 20-38 requires unvaccinated persons in certain settings, including in health care settings such as the Anschutz Medical Campus, to wear a mask.[56] The Tri-County Health Department that serves Adams County issued a Public Health Order that *all* people over two years old must wear a face covering in all public indoor spaces, *regardless of vaccination status*.[57]

Universal masking is required on the Denver Campus by sources external to the University. Denver County Public Health issued its own Public Health Order requiring *all* people over two years old in any public indoor space to wear a face covering, *regardless of vaccination status*.[58] As such, the Denver Campus imposed a requirement that everyone on campus mask while indoors.[59] Ex. W, Decl. of Lacey Klindt, ¶¶9-10.[60]

Testing is an important part of the public health response to COVID-19 and is an absolutely critical part of the CDPHE's strategy in making sure it identifies cases early so that people can stay home, limiting the spread of the virus in the community. Ex. T, ¶¶23-24. "In

---

[56] https://drive.google.com/file/d/1FKIAWsK1iVHy7mLhTK7AhJa6WOYQnEZB/view, last visited Jan. 10, 2022 (PHO 20-38 also "strongly encourage[s]" that healthcare facilities require all unvaccinated staff to undergo daily rapid testing and weekly polymerase chain reaction testing for COVID-19); https://covid19.colorado.gov/mask-guidance, last visited Jan. 10, 2022.
[57] http://www.tchd.org/DocumentCenter/View/9821/Mask-Order-in-All-Public-Indoor-Spaces_11232021, last visited Jan. 6, 2022; https://www.auroragov.org/residents/public_safety/office_of_emergency_management/covid-19_coronavirus_resources, last visited Jan. 6, 2022.
[58] https://www.denvergov.org/Government/COVID-19-Information/Public-Health-Orders-Response/Public-Health-Orders, last visited Jan. 6, 2022; https://www.denvergov.org/files/assets/public/covid19/documents/public-orders/amended-pho-face-covering-order-2021228.pdf, last visited Jan. 6, 2022.
[59] https://www.ucdenver.edu/coronavirus/updatesand, last visited Jan. 6, 2022; https://www.ucdenver.edu/coronavirus/updates/messages/masks-required-indoors-for-everyone-to-defend-against-delta-variant, last visited Jan. 6, 2022. In the rare event where someone who is fully vaccinated is more than ten feet away from all other persons, they may remove their mask while they remain seated.
[60] Ms. Klindt has fully approved, but inadvertently did not sign, her declaration before going on leave. The University will provide a signed copy as soon as it is available.

addition, where there are masked vaccinated populations interacting, testing of those who

vaccinated, and are therefore more likely to become infected than vaccinated individuals, is most

important because it can identify cases early, prevent outbreaks, and promote continuity of

operations. *Id.* at ¶28. The Department of Education advises all colleges and universities with

mixed vaccinated and unvaccinated populations to conduct testing for the presence of COVID-

19, since research supports that about half of transmissions are attributable to asymptomatic

infections.[61] The Department of Education relied upon a National Institutes of Health study that

found around 96% of infections on college campuses might be prevented with such routine

testing in place, when it recommended serial screening of unvaccinated persons only.[62]

## VI.   The Universities and their Policies

### A.   University of Colorado Denver ("UCD")

#### 1.   UCD Campus

The University of Colorado Denver Campus is in the City and County of Denver on the

Auraria Higher Education Center Campus, along with Metropolitan State University of Denver

and the Community College of Denver. § 23-70-105(1)(a), C.R.S. (2021). The three colleges

share numerous facilities, as well as custodial, facilities, and law enforcement staff. Ex. W, ¶5;

Ex. X, ¶6, Decl. of Carrie John. In aggregate, up to 35,000 people learn and work on the Auraria

Campus on any given day. Ex. X, ¶8. The CDC recognizes Denver as "high" risk for community

---

[61] https://www2.ed.gov/documents/coronavirus/reopening-3.pdf, at p. 15-16, last visited Jan. 10, 2022.
[62] Losina E, Leifer V, Millham L, Panella C, Hyle EP, Mohareb AM, Neilan AM, Ciaranello AL, Kazemian P, Freedberg KA., (2021 Apr;174(4):472-483. doi: 10.7326/M20-6558. Epub 2020 Dec 21). College Campuses and COVID-19 Mitigation: Clinical and Economic Value. Retrieved from: https://pubmed.ncbi.nlm.nih.gov/33347322/.

transmission of COVID-19.[63] Denver County has had more than 140,752 cases, and 1,083 deaths due to COVID-19.[64] Ex. A, ¶39. The City and County of Denver requires all public postsecondary personnel be fully vaccinated.[65] Likewise, Denver Public Health issued a Public Health Order requiring *all* people over two years old in any public indoor space to wear a face covering, *regardless of vaccination status*.[66] UCD implemented a corresponding requirement for everyone on campus to mask while indoors, *regardless of vaccination status*.[67] Ex. W, ¶¶9-10. UCD is starting the Spring 2022 semester remotely through January 28th.[68] *Id.* at ¶8.

## 2. UCD Policy

Effective August 23, 2021, UCD implemented the UCD Policy to "protect the health and safety of the University [] community, including all students, staff, faculty, badged contractors, visitors, and volunteers who work or learn on the … Campus." Ex. V, at 1; Ex. W, ¶11. The goal of the policy is to protect the campus community and prevent the spread of COVID-19. Ex. W, ¶12. The UCD Policy was promulgated in reliance upon CDC, Denver Department of Public Health, CDPHE, and internal expert guidance. *Id.* at ¶13.

---

[63] https://www.cdc.gov/TemplatePackage/contrib/widgets/covidcountycheck/, last visited Jan. 6, 2022.

[64] https://covid19.colorado.gov/data, Cases and Deaths by County, last visited Jan. 6, 2022.

[65] https://www.denvergov.org/files/assets/public/covid19/documents/public-orders/amended_ddphe_vaccine_order_9.1.21_web_update.pdf, last visited Jan. 6, 2022.

[66] https://www.denvergov.org/Government/COVID-19-Information/Public-Health-Orders-Response/Public-Health-Orders, last visited Jan. 6, 2022; https://www.denvergov.org/files/assets/public/covid19/documents/public-orders/amended-pho-face-covering-order-2021228.pdf, last visited Jan. 6, 2022.

[67] https://www.ucdenver.edu/coronavirus/updatesand, last visited Jan. 6, 2022; https://www.ucdenver.edu/coronavirus/updates/messages/masks-required-indoors-for-everyone-to-defend-against-delta-variant, last visited Jan. 6, 2022. In the rare event where someone who is fully vaccinated is more than ten feet away from all other persons, they may remove their mask while they remain seated.

[68] https://www.ucdenver.edu/about/leadership/chancellor/communications/messages/covid-updates-booster-requirement-and-jan-18-28-remote-learning, last visited Jan. 12, 2022.

The UCD Policy requires vaccination against COVID-19 with one of the COVID Vaccines. *Id.* at ¶14. The UCD Policy permits students such as Mr. Garlick and Ms. Voelkelt to obtain an exemption to the vaccination requirement for medical, religious, or personal reasons. Ex. V at ¶C.2. To obtain an exemption a student must submit a form through a secure electronic portal. Ex. W, ¶16. Requests for a religious exemption submitted through the portal are automatically granted, and do not distinguish between or preference any religious belief or sect. *Id.* at ¶¶16-18.

Congruent with the Department of Education's guidance stated above, the UCD Policy requires exempt students who come to UCD's Campus to undergo weekly asymptomatic testing. Ex. V, at 2; Ex. W, ¶21. If a student takes all online classes and does not come to the UCD Campus, they need not participate in the asymptomatic testing. Ex. V, at 2. Consistent with both the UCD Policy and the Denver Public Health Order, which applies to *all* persons regardless of vaccination status, the students must wear a mask on campus.[69] Ex. W, ¶24. The testing (and masking) requirements apply regardless of the type of exemption granted at the Denver Campus. Ex. V, at 2; Ex. W, ¶25. No student who sought a religious exemption to UCD's vaccination requirement has been denied, and to date the University has granted 246 religious exemptions to Denver students, including to Mr. Garlick. Ex. W, ¶¶26-27.

---

[69] https://www.denvergov.org/Government/COVID-19-Information/Public-Health-Orders-Response/Public-Health-Orders, last visited Jan. 6, 2022; https://www.denvergov.org/files/assets/public/covid19/documents/public-orders/amended-pho-face-covering-order-2021228.pdf, last visited Jan. 6, 2022.

### B. University of Colorado Anschutz ("Anschutz Medical Campus")

#### 1. The Anschutz Medical Campus

The University of Colorado Anschutz Medical Campus in Aurora houses numerous health sciences schools and hospitals, including but not limited to the UC Health University of Colorado Hospital, Children's Hospital Colorado, and a Veterans Affairs hospital (together, "Anschutz Medical Campus"). *See* Ex. E, Decl. of Chancellor Elliman, ¶¶2-5. Aurora is split amongst Adams, Arapahoe, and Douglas Counties. The CDC recognizes all three as "high" risk for community transmission.[70] Ex. A, ¶35. In Adams County — where the Anschutz Medical Campus is situated — there have been 110,071 cases and 1,285 deaths due to COVID-19.[71] Ex. A, ¶37. The Tri-County Health Department that serves Adams County issued a Public Health Order that *all* people over the age of 2 must wear a face covering in all public indoor spaces, *regardless of vaccination status*.[72] Anschutz Medical Campus is starting the Spring 2022 semester remotely through February 7th.[73]

#### 2. Anschutz Medical Campus Policy

On August 31, 2021, the Colorado Board of Health issued a rule requiring all staff in healthcare facilities, including students and trainees, to be vaccinated against COVID-19. *See* 6 C.C.R. 1011-1:2-12.2.1, 12.2.2(A). Across multiple locations, Anschutz faculty, staff, and students provide care to approximately 2.1 million patients each year. Ex. E, ¶7. As one of

---

[70] https://www.cdc.gov/TemplatePackage/contrib/widgets/covidcountycheck/, last visited Jan. 6, 2022.

[71] https://covid19.colorado.gov/data, Cases and Deaths by County, last visited Jan. 6, 2022.

[72] http://www.tchd.org/DocumentCenter/View/9821/Mask-Order-in-All-Public-Indoor-Spaces_11232021, last visited Jan. 6, 2022; https://www.auroragov.org/residents/public_safety/office_of_emergency_management/covid-19_coronavirus_resources, last visited Jan. 6, 2022.

[73] https://coloradosph.cuanschutz.edu/resources/covid-19, last visited Jan. 12, 2022.

Colorado's largest healthcare providers and the State's only medical school, Anschutz takes its responsibility to promote public health seriously. *Id*. at ¶12. Indeed, on November 5, 2021, DHHS issued an interim final rule requiring facilities to, as a condition of receiving Medicare and Medicaid funding, ensure all "hospital staff, who provide any care, treatment, or other services for the hospital and/or its patients," including students, are fully vaccinated against COVID-19. 42 C.F.R. § 482.42(g)(1)(iii); 86 Fed. Reg. 61555, 61619 (2021) ("DHHS Vaccine Mandate"). The DHHS Vaccine Mandate requires facilities to include a process for covered staff to request exemptions from the vaccination requirement to the extent federal law requires such exemptions. 42 C.F.R. § 482.42(g)(3)(vi). Anschutz accepts Medicare and Medicaid.[74] The Supreme Court recently held that the DHHS Vaccine Mandate is an appropriate exercise of DHHS's authority. *Biden v. Missouri*, No. 21A240, 2022 WL 120950, *2-4, ___ U.S. ___ (U.S. Jan. 13, 2022). In doing so, the Supreme Court put it very plainly:

> [W]e agree with the Government that the [DHHS] rule falls within the authorities that Congress has conferred upon [it] . . . . After all, ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the "very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID-19."

*Id.* at *3 (citing *Florida v. Dept. of Health and Human Servs.*, 19 F.4th 1271, 1288 (CA11 2021)).

Consistent with the Board of Health's and DHHS's requirements, the Anschutz Medical Campus adopted Policy 3012 to require vaccination of all individuals who work or learn on the Anschutz Medical Campus or off campus in connection with Anschutz programs. Ex. E, ¶9. The Anschutz Medical Campus initially adopted Policy 3012 on September 1, 2021 (referred to as

---

[74] https://www.cumedicine.us/docs/default-source/pdf-downloads/cu-medicine-insurance-contract-list.pdf

the "Initial Anschutz Policy") but as infections and hospitalizations rose sharply throughout the month, Anschutz amended Policy 3012 on September 24, 2021 (referred to as the "Amended Anschutz Policy"). *Id.* at ¶10; Ex. L, Amended Policy 3012. The Amended Anschutz Policy provides medical and religious exemptions where otherwise required by federal law. Specifically, as required by the ADA and Section 504 of the Rehabilitation Act, students and employees may seek an accommodation for a medical condition. Ex. E, ¶¶10-11. Likewise, the Amended Anschutz Policy requires the Anschutz Medical Campus to consider employees' requests for an accommodation based upon their sincerely held religious belief consistent with Title VII.[75] Finally, the Amended Anschutz Policy removed certain exemption language — that a belief must be based on a religion "whose teachings are opposed to all immunizations." *Id.* Thus, the Amended Anschutz Policy recognizes that a belief may be individualized, does not prefer any particular faith over another, and does not give any discretion to Anschutz to determine which religious beliefs or practices qualify for exemption.

The Amended Anschutz Policy seeks to safeguard patient and community health, limit transmission of the deadly COVID-19 virus, and reduce staffing shortages wrought by severe illness among providers and staff, which would jeopardize patient care and overburden current resources. *Id.* at ¶¶13-16. The goal to maximize vaccination on the Anschutz Medical Campus complies with federal and state requirements and is consistent with the recommendations of government sources regarding higher education, as well as the consensus amongst medical professional organizations and experts. Ex. A, ¶¶72-75; Ex. G, ¶16. In furtherance of that goal, exemptions are narrow. Anschutz received 74 medical exemption requests and granted only 29:

---

[75] The Initial Anschutz Policy inadvertently authorized religious accommodations for students even though Title VII applies only to employees, not students. Ex. E, ¶¶10-11. The Amended Anschutz Policy corrected this oversight. *Id.*

18 temporary and 11 permanent, based upon known contraindications. Ex. I, Decl. of Dr. Montague, ¶8. In contrast, Anschutz received more than 250 religious exemption requests. Ex. F, Decl. of Melissa Flippin, ¶10. The review process for each type of request is identical, Ex. F, ¶¶6, 9, and if the requestor cannot be accommodated remotely to prevent undue hardship, the request is denied. *Id.* at ¶¶8-9. Regardless of the type of exemption sought, and consistent with federal and Colorado regulatory requirements, unvaccinated providers and students are not allowed to work in facilities on the Anschutz Medical Campus where patients are present. Ex. B, ¶8; K, ¶14; Ex. U, ¶15.

### VII. The Plaintiffs

#### A. Mr. Garlick

Mr. Garlick is a student at the UCD Campus. ECF No. 30, at 27. As of the Spring of 2022, Mr. Garlick is a Senior. Ex. X, ¶19. Mr. Garlick alleges he was previously infected with COVID-19. ECF No. 30, at 28. Mr. Garlick has a religious objection to taking the COVID Vaccines. *Id.* On October 4, 2021, Mr. Garlick requested a religious exemption from vaccination, which the University promptly granted. Ex. W, ¶¶30-31. As such, if Mr. Garlick were to take classes in-person on the UCD Campus he would need to wear a mask and participate in weekly PCR (saliva or nasal) testing as set forth in the UCD Policy. *Id.* at ¶ 32.

Mr. Garlick also "objects generally" to the UCD Policy. ECF No. 1, ¶214. After the University granted Mr. Garlick a religious exemption to the vaccination requirement, Plaintiff communicated via email that he did not wish to comply with the weekly saliva testing required for those exempted from vaccination and disagrees with wearing a mask. ECF No. 30, at 28; Ex. W, ¶33. In response, the University offered Mr. Garlick the chance to take his courses online so he would not have to test or mask since he would not be physically present on campus. Ex. W,

¶ 33-34. Mr. Garlick agreed to take his coursework remotely and chose to take his full load of five classes for the Spring 2022 semester online. ECF No. 30, at 28; Ex. X, ¶18.

Notwithstanding that UCD granted his religious exemption and accorded his request not to participate in either testing or masking, Mr. Garlick asks the Court to order the University to permit him to come to the UCD Campus in-person unvaccinated, unmasked, and without weekly saliva testing, so that he may enjoy the "social interaction associated with in-person learning." ECF No. 30, at 28.

### B. Ms. Voelkelt

Ms. Voelkelt was a student at the UCD Campus. ECF No. 1, ¶247; ECF No. 30, at 30. As of the Spring of 2022, Ms. Voelkelt is a Junior. Ex. X, ¶34. Ms. Voelkelt last signed up for classes at UCD in the Fall 2021 semester. Ex. X, ¶27. She then dropped her courses on August 22, 2021, before the UCD Policy went into effect. *Id.* at ¶28. She has not signed up for any classes for the Spring of 2022. *Id.* at ¶32. Despite not currently being enrolled in classes, Ms. Voelkelt is considered an active student and will continue to be classified as such through Spring 2023. Ex. W, ¶33. If she is an active student, Ms. Voelkelt need not reapply for admission. *Id.*

Ms. Voelkelt alleges in her Complaint that she has a religious objection to taking the COVID Vaccines. ECF No. 1, ¶252. Had Ms. Voelkelt requested a religious exemption under the UCD Policy, the University would have granted her an exemption. *See* Ex. W, ¶¶ 15-17; *see also* Ex. V ("Individuals may be exempted from the requirement to receive a COVID-19 vaccine for medical, religious, or personal reasons. Individuals will automatically receive an exemption if submitted through the campus wide vaccine verification portal."). Ms. Voelkelt has *never* sought a religious exemption to the UCD Policy. Ex. W, ¶37.

Likewise, Ms. Voelkelt has not sought a medical exemption. *Id*. at ¶38. Ms. Voelkelt alleges that she has asthma. ECF No. 1, ¶251. She also alleges her grandfather and an uncle (unclear if by marriage or by blood) had adverse reactions to the swine flu and pertussis vaccinations, respectively, at unknown dates and times. *Id*. at ¶250. Notably, she neither alleges that *she* has ever personally had an adverse reaction to any vaccination, nor that any blood related family member has had an adverse reaction to the COVID Vaccines.

Ms. Voelkelt has not sought *any* type of exemption from the UCD Policy as she claims doing so "require[s] disclosure of her private information." *Id*. at ¶252. Instead, she dropped all her classes and filed this public lawsuit in her own name. Prior to her voluntary disenrollment, the University gave Ms. Voelkelt a $500 per semester scholarship to be applied to her studies. Ex. X, ¶30. Since she did not take the Fall 2021 classes for which she signed up, the money was refunded to the University. *Id*.

### C. Dr. Fow

Dr. Fow is a licensed dentist who was a student on the Anschutz Medical Campus. ECF No. 1, ¶229. Dr. Fow has personal and religious objections to the COVID-19 vaccinations and sought an exemption based upon his faith. *Id.* at ¶¶230-33, 236-37. His request was denied under the Initial Anschutz Policy. *Id.* at ¶¶238, 241. Neither the Initial Anschutz Policy nor the denial under that since-amended policy remain in effect and have been superseded by the Amended Anschutz Policy. Ex. E, ¶10. Dr. Fow is ineligible for a religious exemption under the Amended Policy. Ex. E, ¶11; Ex. Q, at 6.

Dr. Fow is a student in the School of Dental Medicine's Master of Science in Dentistry in Periodontics. ECF No. 1, ¶229. A periodontist specializes in the prevention, diagnosis, and treatment of periodontal disease (a chronic inflammatory disease) that affects gums and bone

supporting the teeth. Ex. U, ¶18. The Commission on Dental Education approved the Anschutz School of Dental Medicine to offer a three-year periodontics program. *Id.* at ¶24. The third-party Commission authorizes a college to educate a specific number of students in the total years of the program and sets standards for required clinical experiences students must obtain. *Id.* at ¶¶25-26. The School of Dental Medicine is authorized for nine periodontal students total, and in line with Commission standards requires its periodontics students to spend 62% of their time in the program in clinical rotations obtaining particular experiences. *Id*. at ¶¶27-28. Clinical experiences are attained by working in the Dental Clinic, which sees an average of 1,560 patients each week. *Id*. at ¶22. On average, a periodontics student in their second year like Dr. Fow would see 498 patients in the Dental Clinic. *Id.* at ¶23. Because Dr. Fow missed out on significant clinical and didactic experiences last semester, he is not in the same place academically as the other two cohort members, and it is unlikely he could "catch up" enough to rejoin them in the Spring of 2022. *Id.* at ¶¶41-43. If the Commission authorizes it, Dr. Fow could join a later cohort, so long as the University stays within its overall limit of nine total students. *Id*. at ¶¶25, 41.

 Vaccination and masking are typical of dental education and practice. Vaccinations are commonly required by the Dental Clinic, due to the tie to patient care and wellness. *Id*. at ¶29. Historically, the School of Dental Medicine has required students to take the flu shot as a condition of patient care activities to maintain Dental Clinic privileges. *Id*. at ¶30. The School of Dental Medicine's records reflect that Dr. Fow complied with that requirement. *Id*. at ¶44. Masking is also standard in dentistry, and currently all clinical providers in the Dental Clinic wear an N-95 mask. *Id*. at ¶¶31-35.

Even if Dr. Fow were eligible for an exemption under the Amended Anschutz Policy, it is highly unlikely the Anschutz Medical Campus could accommodate him without undue hardship since dental care presents a uniquely heightened risk to both provider and patients. Dr. Fow's education includes clinical rotations requiring him to place his hands into, and breathe in intimate proximity to, patients' mouths, and both patient and provider encounter one another's aerosols. Ex. U, ¶¶8, 27-28. One study has concluded that the "risk of COVID-19 infection by dental staff and … the risk of nosocomial transmission in dental practices is considered high [due to] … the short distance to the patient, proximity to saliva, blood, spatter and aerosol exposure."[76] The American Dental Association "strongly" recommends dentists receive the vaccine, and approximately 93.4% of dentists have received at least one dose.[77] No School of Dental Medicine student has received an exemption from the COVID-19 vaccination requirement because the Dental Clinic cannot safely accommodate the student without placing the patients, other providers, auxiliary dental team members, and others at significant risk. Ex. U, ¶¶13-16. And Dr. Fow is not merely a dentist caring for healthy patients. In his education at the Anschutz Medical Campus, he specifically studies and treats periodontal disease. At least one study concluded that because of factors unique to patients with periodontal disease, it is "possible that periodontal status indicates the risk of complication of COVID-19."[78] Given the

---

[76] Gurzawska-Comis, K., Becker, K., Brunello, G., Gurzawska, A., & Schwarz, F. (2020). Recommendations for Dental Care during COVID-19 Pandemic. *Journal of clinical medicine*, *9*(6), 1833. https://doi.org/10.3390/jcm9061833.

[77] https://www.ada.org/publications/ada-news/2021/july/ada-strongly-encouraging-dental-professionals-to-be-vaccinated, *last visited* Dec. 2, 2021 (Reporting that ADA President Daniel J. Klemmedson, D.D.S., M.D. wrote in in an email to members dated July 28, 2021, that dentists should "do our part to move public health forward. If you haven't already been vaccinated, please get vaccinated and encourage your team members and patients to do the same.").

[78] Pitones-Rubio V, Chávez-Cortez EG, Hurtado-Camarena A, González-Rascón A, Serafín-Higuera N. Is periodontal disease a risk factor for severe COVID-19 illness? Med Hypotheses.

applicable federal and state regulatory requirements regarding vaccination, the University likely cannot place Dr. Fow at any clinical site absent vaccination.

## ARGUMENT

A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that they will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury outweighs the injury caused by the injunction, and (4) that an injunction is not adverse to the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Generally, a plaintiff bears the burden of proof to demonstrate that each factor tips in his or her favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003). But here, Plaintiffs' burden on two elements is heightened. Plaintiffs seek a "disfavored" injunction in at least three ways — they request a "mandatory" injunction, which would upset the existing *status quo* under the Amended Anschutz Policy and the UCD Policy, (together referred to as "University Policies") and they seek the same relief they could potentially receive in a full trial on the merits. *Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016). As a result, Plaintiffs bear "a heavier burden on the likelihood of-success-on-the-merits and the balance-of-harms factors: [they] must make a strong showing these tilt in [their] favor." *Free the Nipple v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotation marks omitted).

**I.    Plaintiffs are not substantially likely to succeed on the merits.**

**A.  Plaintiffs have not presented a "case or controversy" to this Court.**

Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2; *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d

---

2020 Nov; 144:109969. doi: 10.1016/j.mehy.2020.109969. Epub 2020 Jun 19. PMID: 32592918; PMCID: PMC7303044.

868, 879 (10th Cir. 2019). "Courts employ three jurisdictional doctrines to 'keep federal courts within their constitutional bounds': standing, mootness, and ripeness." *Prison Legal News*, 944 F.3d at 879 (citation omitted). All Plaintiffs lack standing, and Dr. Fow's claims are moot. Accordingly, Plaintiffs have not presented a "case or controversy" for this Court to adjudicate, and they are unlikely to succeed on the merits of their claims.

### 1.   Plaintiffs lack standing to bring their claims.

To establish standing, "a plaintiff must show an injury that is '(1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling.'" *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)) (internal quotation marks omitted). Plaintiffs bear the burden to establish these three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (*Lujan II*).

The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n* (*Lujan I*), 497 U.S. 871, 907 n.8 (1990)); *see also Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020); *Elec. Privacy Info. Center v. United States Dept. of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019); *Waskul v. Washtenaw Cnty. Comm. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018).

Mr. Garlick and Ms. Voelkelt cannot establish an injury in fact caused by the Denver

Campus Policy for which this Court can provide redress. To establish an injury in fact, Plaintiffs

must demonstrate an actual or imminent concrete and particularized invasion of a legally

protected interest. *Lujan II*, 504 U.S. at 560. The alleged injury cannot be conjectural,

hypothetical, or abstract, and allegations of possible future injury will not suffice. *Id.*; *see also*

*Clapper*, 568 U.S. at 409; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Courts do not

analyze the alleged injury in a vacuum. Instead, courts must determine whether the alleged injury

falls under the "zone of interests to be protected . . . by the . . . constitutional guarantee in

question." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State,*

*Inc.*, 454 U.S. 464, 475 (1982).

Here, Mr. Garlick and Ms. Voelkelt allege the UCD Policy violates their Fourteenth

Amendment right to bodily integrity and autonomy by forcing them, via threat of expulsion, to

get a COVID-19 Vaccine. ECF No. 1, ¶¶ 71, 264-66. As a threshold matter, neither plaintiff has

been threatened with expulsion. Further, neither Mr. Garlick nor Ms. Voelkelt actually faces

forced vaccination or expulsion. Per the UCD Policy, any UCD student will automatically

receive a religious or personal exemption upon request. Ex. V, at 2. Mr. Garlick has in fact been

granted an exemption and therefore does not face the injury he alleges. *See* ECF No. 1-7.

Turning to Ms. Voelkelt, she too would have an exemption from the vaccine requirement,

if she only applied for one.[79] Because she has not even requested an exemption, her only

apparent injury is the requirement to report her vaccination status,[80] which is not a cognizable

---

[79] Since Ms. Voelkelt has not yet applied for an exemption, her claims are also not ripe. *See*
*Robert v. Austin*, No. 21-CV-02228-RM-STV, 2022 WL 103374, *2-3 (D. Colo. Jan. 11, 2022).
[80] It is questionable whether Ms. Voelkelt would actually have to report her status, as any student
who does not provide proof of vaccination will be considered to have been granted an
exemption. Ex. V, at 2

Fourteenth Amendment injury. *See Valley Forge*, 454 U.S. at 475. Ms. Voelkelt does not allege forced speech or meaningfully argue her privacy rights have been violated. Even if she made such allegations, UCD can require students to report private information, including vaccination status, as a condition of attendance. *See* § 25-4-902.5, C.R.S. (2021). Indeed, UCD requires all students to either submit proof they have received certain vaccines other than the COVID-19 vaccines or request an exemption to the vaccination requirement. *See* Ex. Y.

To the extent Ms. Voelkelt claims her injury is the "deferment,"[81] she voluntarily chose to withdraw from her Fall 2021 classes[82] and not enroll in classes for the Spring 2022 semester. A plaintiff's choices in response to a possible injury cannot create an injury in fact. *Clapper*, 568 U.S. at 416 ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves . . . ."); *Lujan II*, 504 U.S. at 560. Even if the alleged deferment could create an injury in fact, it still relies on a generalized intent to return to UCD. *See Lujan II*, 504 U.S at 564. Moreover, Ms. Voelkelt's claim that she will have to reapply is entirely speculative and assumes the UCD Policy as it exists now will still be in place as of the Spring 2023 semester.[83] *Clapper*, 568 U.S. at 410. Finally, to the extent Ms. Voelkelt claims the possible loss of her scholarship as her injury in fact, that injury is again speculative.[84] The possibility Ms. Voelkelt could have to reapply to UCD and/or that she might not receive a scholarship in a future term of enrollment is neither an actual nor imminent injury sufficient to establish standing. *Summers v. Earth Island*

---

[81] Ms. Voelkelt did not apply for an official deferment.

[82] Notably, Ms. Voelkelt dropped her classes on August 22, 2021, before the UCD Policy went into effect. Ex. X, ¶ 28.

[83] Ms. Voelkelt incorrectly asserts she must reenroll by Fall 2022. ECF No. 1, ¶ 253. UCD does not count summer semesters when determining whether a student has become inactive. Accordingly, she will remain an active UCD student so long as she reenrolls by Spring 2023. Ex. X, ¶33.

[84] In fact, UCD informed Ms. Voelkelt that as long as she enrolls by Spring 2023, she will qualify for the $500 scholarship. *Id.* at ¶ 31, 36

*Inst.*, 555 U.S. 488, 499 (2009) ("Standing, we have said, is not an ingenious academic exercise in the conceivable . . . [but] requires . . . a factual showing of perceptible harm.") (internal quotation marks omitted).

Plaintiffs also allege injury to their rights of free exercise, freedom from establishment of religion, and equal protection. ECF No. 30, at 60-62, 73-74. However, the only substantive arguments Plaintiffs make regarding those rights are premised entirely on the alleged "denominal discrimination" Plaintiffs allege arises from the Initial Anschutz Policy's qualifying language, ECF No. 30, at 61. This language is not present in either the Amended Anschutz Policy or the UCD Policy. Consequently, UCD Plaintiffs Garlick and Voelkelt have not and will not suffer any injury premised on that qualifying language. *See Flast v. Cohen*, 392 U.S. 83, 102 (1968) (standing requires "a logical nexus between the status asserted and the claim sought to be adjudicated").

Plaintiffs suggest they are challenging the masking and testing requirements in addition to the vaccine requirement itself. ECF No. 1, at 1 n.1. However, neither the Complaint nor the Motion for Preliminary Injunction make any actual argument as to how either requirement violates their First or Fourteenth Amendment rights. They have therefore waived the issue. *See In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 898 (D. Colo. 2020*); Schlecht v. Lockheed Martin Corp.*, No. 11-cv-03072-RM-BNB, 2014 WL 6778709, *2 (D. Colo. Nov. 25, 2014) ("Undeveloped arguments raised in a perfunctory manner are waived.") (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998)); *Gragert v. Colvin*, No. 12-CV-02641-CMA, 2014 WL 1214028, *5 (D. Colo. Mar. 24, 2014) (arguments unsupported by pertinent authority are deemed waived).

Even assuming the issue was not waived, the generalized threat of discipline for failing to wear a mask does not establish an injury in fact particular to either plaintiff. *See, e.g.*, *Schiavo v. Carney*, No. CV 20-1384-LPS, 2021 WL 2936137, *3 (D. Del. July 13, 2021) (injury cannot be particularized when entire relevant population also suffers from the same "injury"); *Bechade v. Baker*, No. CV 20-11122-RGS, 2020 WL 5665554, *3 (D. Mass. Sept. 23, 2020) (generalized threat of fine faced by all citizens for failure to wear mask did not establish concrete or imminent injury). Even if potential discipline for failing to wear a mask could constitute an injury, it could not be redressed by a favorable decision in this case. The Denver Public Health Order requires all persons, regardless of vaccination status, to wear masks in public indoor spaces. *Clapper*, 568 U.S. at 414 (standing cannot be established by independent actions of third parties); *Lujan II*, 504 U.S. at 560 (same). Therefore, Plaintiffs Garlick and Voelkelt do not have standing to challenge the masking requirement.

Similarly, as for the weekly testing, because Plaintiffs Garlick and Voelkelt have chosen to attend school remotely and unenroll, respectively, they have not and will not suffer that injury. *See Clapper*, 568 U.S. at 416 ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves . . . ."); *Lujan II*, 504 U.S. at 560 (stating injury must be fairly traceable to challenged action of the defendant); ECF No. 1-7 (Mr. Garlick affirmatively stating he has "absolutely no reason to be on campus for the remainder of the semester"). Thus, ultimately, for Mr. Garlick, his complained of injury is the desire to have in person networking and learning, which is not an interest protected by the Fourteenth Amendment. *See Valley Forge*, 454 U.S. at 475. Even were it constitutionally protected, the injury is highly speculative and assumes that if the UCD Policy were not in place, 1) UCD classes would remain in person, 2) school or other campus entities and groups would hold in-person networking events, and 3) other well-connected

individuals would attend in-person networking events during the ongoing global pandemic. Such an "attenuated chain of possibilities" cannot establish an injury in fact or a causal connection to the UCD Policy. *Clapper*, 568 U.S. at 410. It is also belied factually since UCD is starting remotely.

As to Dr. Fow, he can establish neither the causation nor redressability elements of standing. The Amended Anschutz Policy was issued to comply with federal and state mandates requiring the University to ensure all staff who treat patients, including students such as Dr. Fow, are vaccinated against COVID-19. Dr. Fow makes no argument that the Anschutz Medical Campus is free to ignore these mandates. Therefore, any injury stemming from the Amended Anschutz Policy cannot fairly be traced to conduct of the University. *Clapper*, 568 U.S. at 414 (standing cannot be established by independent actions of third parties); *Lujan II*, 504 U.S. at 560 (same). And as explained below, any alleged injuries suffered by Dr. Fow due to language removed from the policy months before Plaintiffs filed this case, are moot.

Turning to redressability, the relief Dr. Fow requests — 1) an order preventing Anschutz Medical Campus from requiring vaccination, masking, and weekly testing and 2) the ability to treat periodontal patients, including many elderly patients, unvaccinated, unmasked, and without testing — would put Anschutz's state licensure and federal Medicaid and Medicare funding at risk. The Court cannot enter an order requiring Anschutz Medical Campus to violate state and federal laws that Plaintiffs do not challenge and have been upheld by the United States Supreme Court as valid, respectively. *See Biden*, 2022 WL 120950, at *2-4. Because Dr. Fow's requested relief would require an injunction not only against Anschutz Medical Campus, but also other governmental entities not party to this litigation, this Court cannot remedy his alleged his injuries.

Because Plaintiffs do not have standing to bring their claims, they are unlikely to succeed on the merits.

### 2.   Dr. Fow's claims are moot.

"Mootness is 'standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Kansas v. Judicial Review v. Stout,* 562 F.3d 1240, 1247 (10th Cir. 2009) (citing *U.S Parole Comm'n v. Geraty*, 445 U.S. 388, 397 (1980)).

Dr. Fow repeatedly makes arguments challenging the University's Initial Anschutz Policy. But the Initial Anschutz Policy was superseded about three weeks after enactment when the University promulgated its Amended Anschutz Policy on September 24 — which was multiple months before Dr. Fow filed suit. ECF No. 1. The Amended Anschutz Policy provides medical and religious exemptions where otherwise required by federal law. Namely, the Amended Anschutz Policy requires the Medical Campus to consider employees' requests for an accommodation based upon their sincerely held religious belief consistent with Title VII.[85] It therefore removes the prior requirement under the Initial Anschutz Policy that the accommodation seeker's religious belief must be based on a religion "whose teachings are opposed to all immunizations." Ex. B, ¶4. As a student, Dr. Fow is ineligible for a religious exemption under the Amended Policy.

Where a party to a lawsuit has withdrawn a challenged action, "a plaintiff cannot maintain a declaratory or injunctive action unless [they] can demonstrate a good chance of being likewise injured by the defendant in the future." *Unified Sch. Dist. No. 259 v. Disability Rights*

---

[85] The Initial Anschutz Policy inadvertently authorized religious accommodations for students even though Title VII applies only to employees, not students. Ex. B, ¶2. The Amended Anschutz Policy corrected this oversight. *Id.*

*Ctr. of Kan.*, 491 F.3d 1143, 1147 (10th Cir. 2007) (internal quotations omitted); *see also McKeen v. Forest Serv.*, 615 F.3d 1244, 1255-56 (10th Cir. 2010) (request for declaratory relief related to permit that had since been superseded was moot). Indeed, "government self-correction provides a secure foundation for mootness so long as it seems genuine." *Prison Legal News*, 944 F.3d at 881(cleaned up). Dr. Fow makes no argument that the Amended Anschutz Policy is not genuine. The repeal and reenactment of the Policy has mooted Dr. Fow's challenges to the Initial Anschutz Policy. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'") (citation omitted).

Nor does the voluntary cessation exception to the mootness doctrine apply. *See Prison Legal News*, 944 F.3d at 881 ("The voluntary cessation exception does not apply, and a case is moot," if the defendant makes it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.") (citations omitted). "[A] defendant must undertake 'changes that are permanent in nature' and "foreclose a reasonable chance of recurrence of the challenged conduct.'" *Id.* (citing *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004)). "Such changes could include 'withdrawal or alteration of administrative policies' through a formal process[.]" *Id.* (citations omitted).

The Policy was repealed and reenacted months prior to the lawsuit being filed and no longer contains the language on which Dr. Fow bases his claims. Under *Prison Legal News*, *supra*, the administrative policy's withdrawal moots these facial challenges, and the voluntary

cessation exception does not apply. Because Fow's claims are moot, he is not substantially likely to succeed on the merits and the preliminary injunction should be denied.[86]

Even if Plaintiffs had standing and their claims were not moot, they still would not be entitled to a preliminary injunction. None of their claims are likely to succeed on the merits, and they cannot make a "strong showing" that the balance of harms tilts in their favor. *Free the Nipple,* 916 F.3d at 797. Their request for preliminary injunction should be denied.

### B.   Plaintiffs are not likely to succeed on their claim that the Policies violate their due process rights.

#### 1.   Under controlling law, states have the authority to require public vaccination during a public health crisis.

The Supreme Court has long recognized a state's ability to require vaccination during a public health crisis. *Jacobson v. Massachusetts,* 197 U.S. 11, 25-26 (1905) (a state's smallpox vaccine mandate was a constitutional exercise of the state's police powers to establish reasonable health laws "to protect the public health and the public safety.") In *Jacobson*, the Court rejected the same argument Plaintiffs make here — that the compulsory vaccination requirement was "unreasonable, arbitrary, and oppressive" and therefore invaded Plaintiff's constitutionally protected liberty interest. *Id.* at 26. The Court reiterated the "fundamental principle" that individual liberty "must yield to the general comfort, health, and prosperity" of the public. *Id*. Because the challenged law had a "real or substantial relation to the protection of the public health and public safety," it was reasonable, and therefore constitutional. *Id*. at 31.

---

[86] Plaintiffs suggest the Amended Policy, which only affects Dr. Fow, also violates the First Amendment's free exercise and establishment clauses. ECF No 30, at 61, 63, 73. However, they make no substantive argument explaining how the Amended Policy's compliance with federal law violates these rights. The issue is therefore waived. *See In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 898 (D. Colo. 2020); *Schlecht v. Lockheed Martin Corp.*, No. 11-cv-03072-RM-BNB, 2014 WL 6778709, *2 (D. Colo. Nov. 25, 2014); *Gragert v. Colvin*, No. 12-CV-02641-CMA, 2014 WL 1214028, *5 (D. Colo. Mar. 24, 2014).

Since *Jacobson*, courts have consistently rejected challenges to public school vaccine mandates, holding that these measures are constitutional as valid exercises of the states' police powers and do not burden individual liberties. *See, e.g., Zucht v. King*, 260 U.S. 174, 175-77 (1922) (upholding dismissal of constitutional challenge to public school mandatory vaccination requirement); *Klaassen v. Trustees of Indiana Univ.,* 7 F.4th 592, 593 (7th Cir. 2021) (*Klaassen II*) ("Given *Jacobson* . . . which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with vaccination against SARS-CoV-2."); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("New York could constitutionally require that all children be vaccinated in order to attend public school."); *Workman v. Mingo Cnty. Sch.*, 667 F. Supp. 2d 679, 690-91 (S.D. W. Va. 2009), *aff'd Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. Appx. 348, 355-56 (4th Cir. 2011) (rejecting parent's claim that she had a fundamental due process right to refuse to have her child vaccinated before attending public school).

The Supreme Court has not overruled *Jacobson*, and the case remains controlling law. The standard articulated in *Jacobson* is "essentially . . . rational basis review." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J. concurring). Plaintiffs nonetheless contend — contrary to the Court's holding in *Jacobson* — that strict scrutiny is the appropriate standard of review because the COVID vaccines are not really "public health measures" as understood in the *Jacobson* case, but instead should be regarded as "forced medical treatment." This forced distinction lacks both factual support and legal merit.

The nature and purpose of vaccines has remained unchanged for decades: vaccines prevent disease, or the severity of disease, by introducing a substance into a body to stimulate an immune response. Ex. P, ¶53. The COVID vaccines meet that definition. *Id*. When the two

mRNA vaccines are introduced into the body, cells create a "spike protein." *Id*. at ¶54. A person's immune system responds to remove it, and that immune response produces antibodies that protect the body from COVID-19. *Id.* Like all vaccines, COVID vaccines are given <u>prior</u> to infection, to prevent morbidity and mortality, not after infection as a "treatment" for an existing disease. *Id*. at ¶56. In medicine, vaccines — including COVID vaccines — thus are not considered medical "treatments." *Id.*

States possess broad authority under the police power to enact reasonable health regulations — specifically including vaccine mandates — to protect public health and safety. *Jacobson,* 197 U.S. at 25-26. In *Jacobson*, the Court upheld a state's smallpox vaccine mandate enacted in the midst of a smallpox outbreak. *Id.* The University's vaccine mandate similarly addresses a health emergency that has caused the deaths of over 800,000 Americans and over 11,000 Coloradans. The University's mandate is a reasonable health measure subject to the same rational basis review articulated in *Jacobson*.

No case cited by Plaintiff compels a different result. Relying on *Cruzan v. Director of the Missouri Department of Health*, 497 U.S. 261 (1990), and other similar cases, Plaintiffs contend the University Policies should be subject to strict scrutiny because the Policies infringe on their liberty interest to decline unwanted medical treatment. [87] ECF No. 30, at 43-44. Plaintiffs' reliance on these cases is misplaced. Those decisions were limited to an individual's choice related to their own care, with no impact on the health of others or the public. For example,

---

[87] These cases do not clearly require a strict or heightened scrutiny analysis. In *Cruzan*, the Court employed a balancing test — not a heightened standard of review — in deciding whether the plaintiff's liberty interests had been violated. *Cruzan,* 497 U.S. at 279 ("[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."). Ultimately, the Court upheld a state statute allowing the state to require clear and convincing evidence of an incompetent person's intent to refuse unwanted treatment before lifesaving nutrition and hydration could be withdrawn. *Id.* at 286-87.

*Cruzan* held an incompetent individual had a constitutional right to refuse unwanted lifesaving hydration and nutrition. *See Cruzan*, 497 U.S. at 279. The Plaintiffs cite no cases undermining *Jacobson's* core holding that a state may establish reasonable vaccination measures to protect public health and safety without unduly intruding on individual liberty. [88]

Finally, Plaintiffs suggest this Court should ignore *Jacobson* because when it was decided, courts were more deferential to government in areas implicating individual rights, and the substantive due process body of constitutional law had not been developed. ECF No. 30, at 46. This Court does not have the authority to ignore controlling Supreme Court precedent.

"[I]t is [the Supreme Court's] prerogative alone to overrule one of its precedents." *Bosse v. Okla.*, 137 S. Ct. 1, 1 (2016) (internal quotations and citations omitted); *Hutto v. Davis,* 454 U.S. 370, 375 (1982) (per curiam) ("[A] precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). At most, lower courts may "declar[e] a decision or doctrine of a higher court defunct" *only* if the court is "certain or almost certain" that the decision "would be rejected by the higher court if a case presenting the issue came before it." *Olson v. Paine, Webber, Jackson & Curtis, Inc.,* 806 F.2d 731, 741 (7th Cir. 1986).

The Supreme Court recently had occasion to revisit the *Jacobson* decision in the context of the COVID-19 pandemic. The decision was not overruled, and both Chief Justice Roberts's

---

[88] The remaining cases Plaintiffs cite likewise involve an individual's liberty interest either in refusing life-saving treatment or with respect to commitment to a mental institution. *See Sell v. U.S.,* 539 U.S. 166, 180-82 (2003) (holding that an individual held for trial had a liberty interest in refusing forced antipsychotic medication); *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (same); *Vitek v. Jones*, 445 U.S. 480, 492-93 (1980) (holding that an inmate had a liberty interest in his transfer to a mental hospital, requiring the state to provide notice and a hearing); *Humphrey v. Cady,* 405 U.S. 504, 508 (1972) (holding that a prison inmate was denied equal protection when he was not afforded a jury determination with respect to his renewal commitment).

concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020)

(Roberts, C.J., concurring), and Justice Gorsuch's concurrence in *Roman Catholic Diocese*, 141

S. Ct. at 70 (Gorsuch, J., concurring), make clear *Jacobson* remains good law. Under these

circumstances, "the very high degree of confidence necessary to justify disregarding decisions of

a higher court" is absent. *Olson*, 806 F.2d at 742.

### 2.   The University's vaccine policies are constitutional even absent the Supreme Court's decision in *Jacobson.*

Even if *Jacobson* was not controlling law, the result would be the same. Courts now

analyze Fourteenth Amendment substantive due process claims using a more formulaic

approach. First, the court evaluates whether a fundamental right is at issue. Second, the court

determines whether the right at issue has been infringed, through either total prohibition or

"direct and substantial" interference. Third, if the claim implicates a fundamental right, strict

scrutiny applies. If no fundamental right is at issue, the court applies rational basis review. *Abdi

v. Wray*, 942 F.3d 1019, 1028 (10th Cir. 2019).

Plaintiffs' contention that the University's COVID policies violate their rights to bodily

integrity or medical choice fails the first step: Plaintiffs' rights are not implicated, much less

burdened, by the University Policies. The Policies do not force students to vaccinate, and

students who choose not to comply with the Policies can seek educational opportunities

elsewhere. Plaintiffs insist they should be able to attend the University in-person without

complying with the University's COVID policies. But there is no fundamental right to an

education. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("Education, of

course, is not among the rights afforded explicit protection under our Federal Constitution.").

Nor is there any fundamental right to be free from a school's mandatory vaccine measures. *Smith

v. Biden*, No. 21-cv-19457, 2021 WL 5195688, *6 (D. New Jersey Nov. 8, 2021) ("[E]very court

that has considered the constitutionality of a COVID-19 vaccine mandate by an employer or university has . . . rejected claims of a fundamental right to refuse a vaccine and applied a rational basis standard of review.") (collecting cases); *Johnson v. Brown*, No. 21-cv-1494, 2021 WL 4846060, *12 (D. Or. Oct. 18, 2021) (holding that the Plaintiffs' "preference not to receive an FDA-authorized vaccine" is not a fundamental right under the Due Process Clause); *Dixon v. De Blasio*, No. 21-cv-5090, 2021 WL 4750187, *8 (E.D.N.Y. Oct. 10, 2021) ("Because the right to refuse vaccination is not a fundamental right, *Jacobson* essentially applied rational basis review — which is exactly what the Court does today.") (internal quotations omitted); *Klaassen v. Trustees of Indiana Univ.*, No. 21-cv-238, 2021 WL 3073926, *22, 24 (N.D. Ind. July 18, 2021) (*Klaassen I*), *aff'd*, 7 F.4th 592 (7th Cir. 2021) (collecting cases and declining to "extend substantive due process to recognize" a fundamental right to be free from COVID-19 vaccination requirements).

Because the University Policies do not implicate Plaintiffs' fundamental rights, they are subject to rational basis review. *Dixon*, 2021 WL 4750187 at *8. As explained below, the Policies easily clear this low bar.

### 3. The University Policies are constitutional under any level of scrutiny.

Under the rational basis analysis, policies must bear a rational relationship to a legitimate government interest. A rational basis review "is highly deferential" toward the government's actions. *Seegmiller v. LaVerkin City,* 528 F.3d 762, 772 (10th Cir. 2008) ("The burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means."). A governmental policy "need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular . . . measure was a rational way to correct it." *Williamson v. Lee Optical of Okla. Inc.,* 348 U.S. 483, 487-88 (1955). Nor does rational basis review give

courts "the option to speculate as to whether some other scheme could have better regulated the evils in question." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004). The government's decision "must be upheld if any state of facts either known or which could reasonably be assumed affords support for it. Second-guessing by a court is not allowed." *Id.* at 1216-17. Plaintiffs bear the burden of negating "every conceivable basis" that might support the challenged measures. *Heller v. Doe*, 509 U.S. 312, 320 (1993).

The governmental goal of stemming COVID-19's spread is not only legitimate but is "unquestionably a compelling interest" and thus satisfies rational basis scrutiny, or even a strict scrutiny analysis. *See Roman Cath. Diocese*, 141 S. Ct. at 67. According to the CDC, the greatest risk of COVID-19 transmission (of the Delta variant) is among unvaccinated people, who are much more likely to get infected and therefore transmit the virus, Ex. A, ¶43, and unvaccinated individuals are two to three times more likely to transmit the Omicron COVID-19 variant than someone who is vaccinated. Ex. P, ¶59. Broad-based vaccination is particularly important to prevent infection and severe illness among people ineligible to receive it. Ex. A, ¶¶48, 49, 67, 70; Ex. P, ¶18. On a higher level, vaccines are the best tool available to decrease the likelihood that new, more lethal mutations of the virus develop. Ex. A, ¶¶21, 58, 59; Ex. P, ¶¶79, 80.

The vaccines also lessen the disease's severity and reduce hospitalizations and deaths. Ex. A, ¶54-55; Ex. P, ¶¶22, 26-29, 59-62, 65. While the vaccines were more effective in preventing severe disease with earlier variants, vaccines are also effective with the Omicron variant: fully vaccinated individuals who have received boosters are nearly fifty times less likely to be hospitalized with the COVID Omicron variant than those who are unvaccinated, and seven times less likely to become infected. Ex. P, ¶¶13, 59, 61, 63-64. Colorado's health care system has been stretched to the limit with individuals hospitalized due to COVID-19 or who test

positive for COVID-19, all of whom require isolation. Ex. T, ¶¶12-16; Ex. P, ¶¶26-27. By requiring vaccination and masking, [89] the University Policies advance the goals of protecting students, faculty, and staff, allowing the continued operation of educational facilities, safeguarding patient health at the University's hospitals, and avoiding health services' disruption brought about by severe illness among providers and staff or rationing of care due to burdens upon the system. Ex. P, ¶¶15-16, 19-20, 23-24, 26-29. The University has narrowly tailored its Policies to advance those ends, requiring vaccination on the Anschutz Medical Campus, where public and patient health is most directly affected, and allowing personal exemptions from vaccination on the University's Denver campus.

 Plaintiffs' disagreement with generally accepted scientific data and opinions does not satisfy Plaintiffs' burden to negate the University's legitimate reasons for establishing the Policies. Plaintiffs' experts' contentions that the vaccines are unduly risky, or that they have little public benefit, are not accepted by either the CDC or by most healthcare providers. But even if this Court credits Plaintiffs' experts' opinions, Plaintiffs have presented, at most, differences of medical opinion, and "the court doesn't intervene so long as [Defendants'] process is rational in trying to achieve public health." *Klaassen I*, 2021 WL 3073926, *38 (citing *Phillips*, 775 F.3d at 542) ("[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the [policymaker], not the individual objectors.")

---

[89] Plaintiffs do not contend that masking is harmful or ineffective in preventing disease transmission or severity. Even with the Omicron variant, masking is associated with a decrease in hospitalizations. Ex. A, ¶74. Court have consistently found that masking requirements survive rational basis scrutiny and do not implicate fundamental rights to trigger strict scrutiny. See *infra* n.99 (listing cases).

The University implemented its policies based on the best available medical and scientific evidence. The Policies rationally relate to the University's interest in stemming the spread of COVID-19, keeping campus functioning for all students and employees, and maintaining an operational and effective health care system. These are also "compelling" interests under a strict scrutiny analysis, and the University has narrowly tailored its Policies to achieve these goals. Under *Jacobson*, the University Policies are subject to rational basis review, but these policies survive under even strict scrutiny. Plaintiffs are thus unlikely to succeed on the merits of their claims, and their request for preliminary injunction should be denied.

**C.  The University Policies do not violate the unconstitutional conditions doctrine.**

Plaintiffs' contention that the University Policies unconstitutionally force students to choose between their religion and receiving a government benefit lacks merit. ECF No. 30, at 34-37. It is true "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545 (1983)). But the unconstitutional conditions doctrine "only applies if the government places a condition on the exercise of a constitutionally protected right." *Petrella v. Brownback*, 787 F.3d 1242, 1265 (10th Cir. 2015). The doctrine does not apply to these facts because Plaintiffs' ability to attend the University is not conditioned upon them giving up an enumerated constitutional right since there is no fundamental right to refuse vaccination. *See Zucht,* 260 U.S. at 175-77; *Jacobson*, 197 U.S. at 31.

Plaintiffs' reliance on *Dahl v. Board of Trustees of West Michigan University*, 15 F.4th 728 (6th Cir. 2021), is unpersuasive. In *Dahl*, the court held Western Michigan University's vaccination policy burdened the students' free exercise of religion because the mandate "penalize[s] a student otherwise qualified for intercollegiate sports by withholding the benefit of

44

playing on the team should she refuse to violate her sincerely held religious belief." *Id.* at 732-33. But the court did not resolve the issue on that basis. *Id.* It recognized that not every burden on the free exercise of religion is unconstitutional — only those that are not neutral and generally applicable. *Id.* Ultimately, the court concluded the policy's formal mechanism for providing individual exemptions[90] to the vaccine rendered the policy neither neutral nor generally applicable and thus subject to strict scrutiny review.[91] *Id.*

 *Dahl* is not binding on the Court, is factually distinguishable, and is an outlier. It ignores well established jurisprudence that a state may require vaccination as a condition to attending public school. *See, e.g., Zucht*, 260 U.S. at 176 (stating it is "settled that it is within the police power of a state to provide for compulsory vaccination"). Other courts have considered and rejected the unconstitutional conditional doctrine as applied to COVID-19 vaccine mandates because no enumerated constitutional right is at stake. *Klaassen II*, 7 F.4th at 593 (affirming that Indiana University's vaccine mandate does not encroach on upon a fundamental right); *Oklahoma v. Biden*, No. CIV-21-1136-F, 2021 WL 6126230, *13 (W.D. Okla. Dec. 28, 2021); *Smith*, 2021 WL 5195688, *8; *Norris v. Stanley*, No. 1:21-CV-756, 2021 WL 4738827, *3 (W.D. Mich. Oct. 8, 2021). Even if continued enrollment at the University were a conditional benefit for the purposes of the doctrine, the Plaintiffs would still fail because a "condition cannot be unconstitutional if it could be constitutionally imposed directly." *Rumsfeld v. F. for Acad. & Inst.*

---

[90] Western Michigan State's vaccine policy provided student-athletes medical or religious exemptions and considered accommodations on an individual basis. *Dahl*, 15 F.4th. at 730. Several student athletes applied and were denied or never received an answer, and a university official confirmed she "barred every unvaccinated student-athlete from 'engag[ing] in team activities.'" *Id.*

[91] As discussed in Argument Section I.D.2, *infra*, the policy did not survive strict scrutiny since it was not narrowly tailored.

*Rts., Inc.*, 547 U.S. 47, 59-60 (2006). Plaintiffs have not shown a likelihood of success on their claim that the University's Policies cannot constitutionally be imposed directly.

### D.  The courts have long rejected Free Exercise challenges to vaccine requirements.

Opponents have long challenged mandatory vaccination policies as violating their Free Exercise rights, and Courts have consistently rejected such challenges. *See Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community of the child to communicable disease or the latter to ill health or death."); *Phillips*, 775 F.3d at 543 ("New York could constitutionally require that all children be vaccinated in order to attend public school."); *see also Jacobson*, 197 U.S. at 31. Even the Supreme Court's seminal Free Exercise decision, *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), recognizes that mandatory vaccine requirements do not offend the Free Exercise Clause. In rejecting a religious exemption from Oregon's peyote ban, Justice Scalia highlighted the slippery slope that would result if the challengers' position were adopted:

> The rule respondents favor would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind — ranging from compulsory military service, to the payment of taxes, to health and safety regulation such as manslaughter and child neglect laws, *compulsory vaccination laws*, drug laws, and traffic laws, to social welfare legislation such as minimum wage laws, child labor laws, animal cruelty laws, environmental protection laws, and laws providing for equality of opportunity for the races. *The First Amendment's protection of religious liberty does not require this.*

*Id.* at 889-90 (emphasis added; internal citations omitted). Following *Smith*'s binding guidance, numerous federal courts have recently considered and rejected Free Exercise challenges to

mandatory COVID-19 vaccination policies.[92] *See Does 1-6 v. Mills*, 16 F.4th 20, 24 (1st Cir. 2021). Based on this authority alone, Plaintiffs are not substantially likely to succeed on the merits of their Free Exercise claim.

### 1. The University Policies are neutral and generally applicable, easily satisfying rational basis review.

Under *Smith*, a "neutral law of general applicability" is subject to rational basis review even if it incidentally burdens a particular religious practice. 494 U.S. at 878-79. The University Policies are both neutral and generally applicable.

### a.    Neutrality

Neutrality hinges on whether a law's object "is to infringe upon or restrict practices *because of* their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (emphasis added). The court analyzes both whether the law is facially neutral and whether the government acts in "a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Does 1-6 v. Mills*, No. 21-cv-00242-JDL, 2021 WL 4783626, *7 (D. Me. Oct. 13, 2021) (quoting *Lukumi*, 508 U.S. at 533, and *Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868, 1877 (2021)).

---

[92] *See, e.g., Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1175-78 (9th Cir. 2021); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280-90 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *Does 1-6 v. Mills*, 16 F.4th 20, 29-35 (1st Cir. 2021); *We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Dev.*, No. 3:21CV597 (JBA), 2022 WL 105191, *1 (D. Conn. Jan. 11, 2022); *Dr. T., et al. v. Alexander-Scott, et al.*, No. 121CV00387MSMLDA, 2022 WL 79819, *8 (D.R.I. Jan. 7, 2022); *Troogstad v. City of Chicago*, No. 21 C 5600, 2021 WL 6049975, *6 (N.D. Ill. Dec. 21, 2021); *Troogstad v. City of Chicago*, No. 21 C 5600, 2021 WL 5505542, *11 (N.D. Ill. Nov. 24, 2021); *Doe v. San Diego Unified Sch. Dist.*, No. 21-CV-1809-CAB-LL, 2021 WL 5396136, *3-5 (S.D. Cal. Nov. 18, 2021); *Bacon v. Woodward*, No. 21-CV-0296-TOR, 2021 WL 5183059, *4-5 (E.D. Wash. Nov. 8, 2021); *Wise v. Inslee*, No. 21-CV-0288-TOR, 2021 WL 4951571, *2-4 (E.D. Wash. Oct. 25, 2021); *Klaassen I*, 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021).

Here, the University Policies are neutral both facially and as applied. They do not single out religious practices for disfavored treatment because of their religious nature. To the contrary, the Amended Anschutz Policy mentions the word "religion" only to reference the availability of religious accommodations required by federal employment law. Ex. L, at 3-4. The availability of a religious accommodation for Anschutz employees "expressly *favors*" religious practices. *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021). It does not target them for disfavored treatment. *Lukumi*, 508 U.S. at 533.

There is no merit to Plaintiffs' argument that the Amended Anschutz Policy is still not neutral or generally applicable because it "disfavors those religions practiced by students while favoring those practiced by employees, 'effectively distinguishing' between the two sets of religions." ECF No. 30, at 61. This argument ignores that the law permits the University to treat different categories of people differently for non-religious reasons without violating the general-applicability requirement. *See Doe v. San Diego Unified Sch. Dist*., 19 F.4th 1173, 1180 (9th Cir. 2021) (upholding vaccine policy permitting religious accommodations for employees but not students); *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021) (generally applicable law "applies to an entire *class* of people" and need not "apply to all people, everywhere, at all times").

Moreover, the Anschutz Medical Campus's reason for distinguishing between employees and students has nothing to do with favoring secular conduct over religious conduct or favoring one religious denomination over another. *See Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 701 (10th Cir. 1998) (rejecting Free Exercise challenge where public school's policy against part-time attendance contained exceptions that were not "in any way based on religious categorization or discrimination"). Rather, the University's distinction is rooted in federal statute — specifically, Title VII of the Civil Rights Act of 1964. The Act protects employees, not

students, and requires employers to offer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business. 42 U.S.C. §§ 2000e-2(a)(1), 2000e(j). The University's attempt to conform the Amended Anschutz Policy to federal statute constitutes a lawful, secular basis for distinguishing between employees and students. *See San Diego Unified Sch. Dist.*, 19 F.4th at 1180; *see also Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) ("[W]e have already refused to interpret *Smith* as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption."); *Wise v. Inslee*, No. 21-CV-0288-TOR, 2021 WL 4951571, *1 (E.D. Wash. Oct. 25, 2021) (upholding vaccination policy that "acknowledges" the availability of certain exemptions for "disability-related accommodations" and "sincerely held religious belief accommodations" under federal statutes).

The University fully respects the religious beliefs of its entire campus community. Ex. E, ¶11. Far from targeting religion, the change between the initial and amended policies merely reflects the University's attempt to strengthen its policy so that it better achieves the University's legitimate and compelling goal of protecting the University community against COVID-19 while also complying with federal statutes and recent federal court holdings under the Free Exercise Clause. *See* Ex. E, ¶10. As such, the Amended Anschutz Policy is neutral.

So too is the UCD Policy, which grants an exemption to any individual who seeks it from the requirement to receive a COVID-19 vaccine for medical, religious, or personal reasons, and has never denied an exemption request. Ex. V, at 2 ("Individuals will automatically receive an exemption if submitted through the campus-wide vaccine verification portal."); Ex. W, ¶26 (the University has approved every religious exemption request). The University does not retain

discretion to extend exemptions in whole or in part to those who have applied for them. *See* Ex. W, ¶¶15-20. (describing process of requesting and granting automatic extensions under the UCD Policy). Additionally, the UCD Policy provides that any student that does not provide evidence of their vaccine status or otherwise seek an exemption is considered to have a personal exemption and subject to safety protocols (masking and testing) contained in the policy. Ex. V, at 2. These safety protocols are facially neutral and apply to any individual who receives an exemption for personal, medical, or religious reasons.

### b.    General Applicability

A law may not be "generally applicable" under *Smith* for either of two reasons: if it either (1) "'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions,'" or (2) "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 284 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (quoting *Fulton*, 141 S. Ct. at 1877). Plaintiffs argue under the second category that the Amended Anschutz Policy — which applies only to Dr. Fow — is not generally applicable because it permits the University to grant students medical exemptions but not religious exemptions. ECF No. 30, at 61. In their view, unvaccinated individuals with medical exemptions could pose risks that are similar to unvaccinated individuals who harbor religious objections. *Id.*

Federal courts have roundly rejected this argument, reasoning that religious exemptions present risks to the government's safety interests that medical exemptions do not. *See, e.g., Hochul*, 17 F.4th at 286; *Mills*, 16 F.4th at 30-31; *San Diego Unified Sch. Dist.*, 19 F.4th at 1179-80. In *Hochul*, for example, the Second Circuit upheld New York's rule requiring vaccinations for healthcare employees which permitted a medical exemption but no religious exemption. 17

F.4th at 272-73. The court explained that compelling vaccines for those workers who are subject to medical contraindications could harm their health, making it less likely they could continue working, which would lead to "staffing shortages that can compromise the safety of patients and residents even beyond a COVID-19 infection." *Id.* at 285. By contrast, applying the vaccine mandate to employees who oppose the vaccine on religious grounds does not undermine the government's interest in "protecting the health of covered [healthcare] personnel." *Id.* at 285-86. The court also cited to evidence that medical exemptions are more likely to be "limited in duration," while one's religious beliefs are "unlikely to change to permit vaccination in the future," and, further, that medical exemption requests in New York were "more limited in number" than religious exemption requests. *Id.* at 286. "[I]t may be feasible for healthcare entities to manage the COVID-19 risks posed by a small set of objectively defined and largely time-limited medical exemptions," the Second Circuit explained, while a "much greater number of permanent religious exemptions" could "pose a significant barrier to effective disease prevention." *Id. Hochul* therefore stands for the rather obvious point that medical and religious exemptions are "not comparable in terms of the 'risk' that they pose." *Id.* (citing *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021)).

*Hochul*'s reasoning is on all fours here. The University promulgated its Amended Anschutz Policy offering medical exemptions to protect its vulnerable patient population from COVID-19, and the health of its employees and students for whom a vaccine is contraindicated. Ex. I, ¶6. The University is a teaching hospital, meaning both its employees and students supply critical healthcare services to patients, who also benefit from the policy. Ex. E, ¶¶3-4. Requiring a University employee or student to receive a vaccine when it is contraindicated would put their health in jeopardy, making it less likely they could continue working, which, in turn, would

51

subject University to greater difficulty "keep[ing] its healthcare facilities staffed in order to treat patients, whether they suffer from COVID-19 or any other medical condition." *Mills*, 16 F.4th at 31. Further, the vaccine contraindications of which the University is aware are more likely to be temporary, Ex. I, ¶8, in contrast to the continuing nature of one's religious beliefs. *See Hochul*, 17 F.4th at 286. Last, more than three times as many people sought religious exemptions than medical exemptions. *Compare* Ex. F, ¶10 *with* Ex. I, ¶8. The University's interests will be undermined to a far greater degree if religious accommodations for students must be granted. *Hochul*, 17 F.4th at 286. Accordingly, the Amended Anschutz Policy permitting medical but not religious accommodations to students is generally applicable.

At bottom, Plaintiffs have failed to carry their burden to prove the University Policies are not neutral and generally applicable. Rational basis review therefore applies. *Klaassen I*, 2021 WL 3073926, at *24 (noting "the consistent use of rational basis review to assess mandatory vaccination measures"). The University Policies easily pass this deferential test. Requiring vaccinations for UCD Campus and Anschutz Medical Campus students, who treat patients, as a method to combat a virus that has resulted in the deaths of more than 11,087 Coloradans is "a reasonable exercise of the [University's] power to enact rules to protect the public health."[93] *Hochul*, 17 F.4th at 290.

---

[93] https://covid19.colorado.gov/data, last visited Jan. 16, 2022. The federal courts overwhelmingly agree that vaccine mandates pass rational basis review. *See, e.g., Mills*, 16 F.4th at 32; *Klaassen II*, 7 F.4th at 593-94 (7th Cir. 2021); *Slidewaters LLC v. Wash. State Dept. of Lab. & Indus.*, 4 F.4th 747, 758-59 (9th Cir. 2021); *San Diego Unified Sch. Dist.*, 19 F.4th at 1180; *Dixon v. De Blasio*, No. 21-cv-5090, 2021 WL 4750187, *8 (E.D.N.Y. Oct. 10, 2021); *Valdez v. Grisham*, No. 21-cv-783, 2021 WL 4145746, *9 (D.N.M. Sept. 13, 2021), *aff'd* (10th Cir. Dec. 15, 2021) (unpublished, attached as Ex. Z) (upholding the district court's rational basis review of New Mexico's vaccine mandate that applied to all health care workers among others); *Harris v. Univ. of Massachusetts, Lowell*, No. 21-cv-11244, 2021 WL 3848012, *6 (D. Mass. Aug. 27, 2021); *America's Frontline Doctors v. Wilcox*, No. EDCV 21-1243 JGB, 2021 WL 4546923, *4-5 (C.D. Cal. July 30, 2021).

**2. Even if strict scrutiny applied, the University satisfies it.**

Because the University has a compelling interest in protecting the health and safety of its employees, students, community, and for Anschutz, its patients, and has narrowly tailored its policies to address that interest, the Policies survive strict scrutiny.

In support of its policies, the University relied on various sources including the Denver Department of Public Health, CDPHE, internal expert sources, and reports from the CDC documenting that "COVID-19 vaccines are a key component in controlling the COVID-19 pandemic." Ex. A, ¶43; *see also* Ex. W, ¶13. An August 26, 2021 CDC report, for example, found that "the greatest risk of transmission [of COVID-19] is among unvaccinated people who are much more likely to get infected, and therefore transmit the virus."[94] Consistent with this CDC advice, the Amended Anschutz Policy limits in-person contact to vaccinated individuals because employees and students have a greater risk of contracting COVID-19 if they interact with unvaccinated patients, coworkers, and classmates.[95] This interest qualifies as a compelling one despite Plaintiffs' arguments to the contrary. *See Roman Cath. Diocese*, 141 S. Ct. at 67 ("Stemming the spread of COVID–19 is unquestionably a compelling interest[.]").

---

[94] Ex. A, ¶43 (referencing *Delta Variant: What We Know About the Science*, Centers for Disease Control and Prevention (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.)

[95] The Supreme Court recognizes that courts should generally defer to "the reasonable medical judgments of public health officials." *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 288, (1987). The CDC is the federal agency responsible for protecting the public health of the country by providing leadership and direction in the prevention and control of diseases. "It isn't the job of the judiciary to second-guess the 'wisdom, need, or appropriateness' of the measures taken by a state to protect the health of its people during a pandemic." *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 828 (D. Colo. 2020); *see also Jacobson*, 197 U.S. at 28, 30-35 ("It is no part of the function of a court . . . to determine [what is] likely to be . . . most effective for the protection of the public against disease.").

The University has narrowly tailored its Amended Anschutz Policy governing religious and medical exemptions to achieve its compelling interest in reducing the spread of COVID-19. The University applied its Amended Anschutz Policy affording religious exemptions to its employees in compliance with Title VII and provided accommodations to those employees who could perform their work remotely or in isolation. Ex. B, ¶7; Ex. F, ¶¶7-8. The University made similar accommodations for medical exemptions. Ex. I, ¶¶5-6, 8; Ex. F, ¶9; *see Fulton*, 141 S. Ct. at 1881.

These facts distinguish the Amended Anschutz Policy from the vaccine mandate at issue in *Dahl*. There, the court explained that Western Michigan University's vaccine requirement for student athletes was not a narrowly tailored public health measure since the school allowed similar conduct that "create[s] a more serious health risk" by permitting its non-athletes — the majority of its students — to remain unvaccinated. *Dahl*, 15 F.4th at 734-35. By directing the policy solely at the student athletes, Western Michigan University failed to narrowly tailor its policy to achieve its interest in preventing the spread of COVID-19. *Id*. at 735. Here, however, the policies apply to all its employees and students who pose a risk of COVID-19 exposure and transmission from in-person contact at University facilities and programs. Unlike *Dahl*, the current policies do not allow any government official discretion to consider the merits of an individual's request for an exemption. And, unlike the university's athletes-only policy, the Anschutz Amended Policy is not underinclusive even under *Dahl* because it encompasses every student that studies or works on the Anschutz Medical Campus or facilities, not just a subset of students.

The University has also narrowly tailored its policies to address the University's compelling interest. The policies use the least restrictive alternative available to achieve its goal

of protecting the University communities from the spread of COVID-19. At the UCD Campus,
individuals who receive an exemption are required to get tested weekly and wear a mask on
campus. These scientifically supported safety protocols are narrowly tailored and are not an
unreasonable burden for individuals who choose not to vaccinate. Ultimately, vaccines provide
the safest and most effective means to reduce serious illness and death caused by COVID-19. Ex.
A, ¶¶40-59. Alternative forms of personal protection, like masks and gloves, are less effective at
reducing the rates of COVID-19 transmission and do nothing to reduce the severity of COVID-
19 symptoms once a person contracts the virus. *Id.* at ¶57. The University Policies requiring
vaccination therefore survive strict scrutiny.

### E. Plaintiffs' Establishment and Equal Protection Clause claims fail because they are based on a policy that is no longer in effect.

Plaintiffs are unlikely to succeed on their Establishment or Equal Protection Clause
claims because they are based on the Initial Anschutz Policy, not on the Amended Anschutz
Policy or Denver Campus Policy currently in effect.[96] Plaintiffs' Establishment Clause claim
depends on qualifying language contained in the Initial Anschutz Policy that *never* applied to
Plaintiffs Garlick or Voelkelt, which limited eligibility for religious exemptions to those beliefs
and practices that opposed all vaccines. Plaintiffs refer to the defunct Initial Anschutz Policy
repeatedly in support of their argument. *See* ECF No. 30, at 60 (arguing "[i]n the present, case
CU's discrimination under the Original Exemption Policy 'is expressly based on the . . .
religiosity of the [students]'"); *id*. at 61 ("under the Original Exemption Policy, CU students had

---

[96] In passing, Plaintiffs argue that the Amended Anschutz Policy favors employees' religions over students' religions, ECF 30, at 63, but their focus is on the Initial Anschutz Policy. This difference in the policy is discussed in Background Section, *supra*, at VI.B.2. Because they make no substantive argument regarding the alleged favoring of employees' religions over students', Plaintiffs have waived the issue. *See In re HomeAdvisor*, 491 F. Supp. 3d at 898*; Schlecht*, 2014 WL 6778709, at *2; *Gragert*, 2014 WL 1214028, at *5.

to have a religiosity of a very certain sort to qualify: it required students to adhere to a denomination whose 'teachings are opposed to *all* immunizations."); *id.* at 62 (arguing "CU determined that only religions that have recognized 'teachings" were permissible"); *id.* at 63 (arguing "the Original Exemption Policy violates the Establishment Clause's prohibition of excessive entanglement"); *id.* at 64 (describing correspondence related to Dr. Fow's eligibility to receive a religious exemption under the Initial Anschutz Policy); *id.* at 65 (arguing that "the Original Exemption Policy *did* create excessive entanglement"); *id* at 66 ("Because the Original Exemption Policy permits excessive entanglement, on that ground alone it is 'unconstitutional without further inquiry'"); *id.* at 68 (arguing that the University "den[ies] exemptions to adherents of religions not deemed worthy"); *id.* at 70 (arguing "CU cannot adequately explain why the exemptions that must be granted for medical or *some* religious reasons cannot similarly be granted to all with sincere religious objections.").

Neither the Anschutz Amended Policy nor the Denver Campus Policy contain any qualifying language for which religions are eligible for exemption. *See* Ex. L; Ex. V. At UCD, anyone of any faith who requests a religious exemption receives it. At Anschutz, no student is eligible for such an exemption, regardless of faith. Because the University's current policies do not prefer one faith over another, no denominational discrimination exists, and the University avoids *all* entanglement about which religious beliefs and practices may qualify for a religious exemption. Plaintiffs are therefore unlikely to succeed on their Establishment Clause claim.

Plaintiffs' arguments that the University violated the Equal Protection Clause are similarly based on the language, and purportedly corresponding Free Exercise and Establishment violations, from the Initial Anschutz Policy. *See* ECF No. 30, at 74 (arguing "'[I]nterdenominational discrimination' is a [v]iolation of the Equal Protection and Free Exercise

Clauses"); *id.* at 74-75 (arguing "explicit and deliberate distinctions between different religious organizations burden the Equal Protection Clause"); *id.* at 75 (arguing that the University's violation of the Establishment and Free Exercise Clauses also violate the "parallel" protections of the Equal Protection Clause); *id.* (arguing "[b]ecause the Exemption policies are neither neutral nor generally applicable, but run afoul, on multiple grounds, of the Equal Protection Clause").[97] This reliance is misplaced because, as explained above, *see supra* Argument Sections I.D. and E, the vaccine policies violate neither the Free Exercise Clause nor the Establishment Clause, and Plaintiffs are not likely to prevail on those claims. Therefore, Plaintiffs are likewise unlikely to prevail on their Equal Protection Clause claim.

### F. The Denver Campus masking and testing safety protocols are constitutional.

In their complaint, Plaintiffs "broadly challenge all portions of CU's requirement to take a COVID vaccine," and state that the definition of "'Mandate' includes CU's general requirement, along with each campuses guidance and requirements for implementation and exemptions.'" ECF No. 1, at 1 n.1. Presumably this challenge includes the masking and testing required as part of the University's policies. But Plaintiffs' motion for preliminary injunction contains no legal argument challenging the constitutionality of the masking and testing safety protocol — the "Extra Requirements" that the Denver Campus Policy requires for those who are unvaccinated.[98]

---

[97] Plaintiffs' argument the Amended Anschutz Policy, "gives preference to employees' religions over students' religions," in violation of the Establishment Clause's "'clearest command,' 'that one religious denomination cannot be officially preferred over another,'" ECF No. 30, at 63, is addressed in Argument Section I.E. above.

[98] As explained above, both campuses are subject to county public health orders requiring all persons over the age of two to wear a mask in public indoor spaces regardless of vaccination status. Thus, the mask requirement is not an "extra requirement" imposed due to Plaintiffs' vaccination status.

The preliminary injunction motion focuses solely on whether requiring the COVID-19 vaccine violates Plaintiffs' constitutional rights, and never addresses whether or how the "Extra Requirements" of masking and testing violate their substantive due process or First Amendment rights. *See, e.g.,* ECF No. 30, at 2 (stating "even if granted an exemption, Students are still subject to Extra Requirements like *inter alia* weekly mitigation testing, mandatory face masks, physical distancing, etc.," and "[t]here are no meaningful exemptions to these extra requirements")*; id.* at 28 (Mr. Garlick asserting he could not get an exemption that would eliminate his harms — still requiring him to subject to the Extra Requirements — and admitting that he could obtain an exemption from the Extra Requirements but only if he was in a 'fully online [program] and won't step on campus for any reason this semester[.]"); *id.* at 31 (even though Ms. Voelkelt did not apply for an exemption, "no exemption would alleviate her harms — still requiring her to subject to the Extra Requirements.").

Plaintiffs acknowledge "the CDC's guidance for unvaccinated people is to *wear a mask*, social-distance at least six feet apart from other individuals, avoid any sort of crowd whether it be outside or in, *get tested*, sanitize often, and monitor health." *Id.* at 12 (emphases added). And contrary to arguing that the masking and testing are unconstitutional, Plaintiffs argue that existing measures (including voluntary vaccination, masking, social distancing, sanitizing, and testing) have already returned citizens largely to the *status quo ante*, and that continuing such measures, rather than adding a vaccine mandate, would be the least restrictive means of accomplishing the University's public health goals. *Id.* at 52.

Plaintiffs put forth no legal argument challenging the University's masking and testing safety protocols, waiving the issue, *See In re HomeAdvisor*, 491 F. Supp. 3d at 898*; Schlecht*, 2014 WL 6778709, at *2; *Gragert*, 2014 WL 1214028, at *5, but if they reviewed the issue, they

would have found that courts confronting this issue reject substantive due process claims because such challenges do not implicate fundamental constitutional rights. There is no fundamental right not to wear a mask during a pandemic.[99] Nor is there a fundamental constitutional right to not be tested for a virus before entering a place of public accommodation.[100] To the extent Plaintiffs argue they have rights to refrain from wearing a mask and to refuse saliva testing, these are not rights so "deeply rooted in this Nation's history and tradition" and so "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Plaintiffs are unlikely to succeed in expanding substantive due process rights to include the rights not to wear a mask or to be tested for a virus during a pandemic.[101]

---

[99] *See Kelly v. Imagine IF Library Entity*, No. CV 21-6-M-DLC-KLD, 2021 WL 2444663, *4 (D. Mont. June 15, 2021); *Whitfield v. Cuyahoga Cnty. Pub. Library Found.*, No. 1:21 CV 0031, 2021 WL 1964360, *3 (N.D. Ohio May 17, 2021); *Denis v. Ige*, 538 F. Supp. 3d 1063, 1076-78 (D. Haw. May 12, 2021); *W.S. by Sonderman v. Ragsdale*, 540 F. Supp. 3d 1215, 1215 (N.D. Ga. May 12, 2021); *United States v. Berglund*, No. 20-cr-00200 (SRN/TNL), 2021 WL 1589548, *1 (D. Minn. Apr. 23, 2021) ("Courts have repeatedly found that requiring participants at trial to wear face masks due to the COVID-19 pandemic does not violate a criminal defendant's constitutional rights."); *Forbes v. City of San Diego*, No. 20-cv-00998-BAS-JLB, 2021 WL 843175, *5, (S.D. Cal. Mar. 4, 2021); *Stewart v. Justice*, 518 F. Supp. 3d 911, 918-19 (S.D. W. Va. Feb. 9, 2021); *Oakes v. Collier Cnty.*, 515 F. Supp. 3d 1202, 1208 (M.D. Fla. Jan. 27, 2021); *Shelton v. City of Springfield*, 497 F. Supp. 3d 408, 414 (W.D. Miss. 2020); *see also Ryan v. Cnty. of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995) (no constitutional right to *wear* a mask).

[100] *See Klaassen II*, 7 F.4th at 593-94 (finding mandatory vaccination or weekly testing a reasonable condition of enrollment at a university); *see also Webb v. Johnson*, No. 4:21CV3042, 2021 WL 2002712, *5 (D. Neb. May 19, 2021) (prisoner had no fundamental right to refuse having his temperature taken); *Aviles v. De Blasio*, No. 20 Civ. 9829 (PGG), 2021 WL 796033, *18 (S.D.N.Y. Mar. 2, 2021); *Wilcox v. Lancour*, No. 2:20-cv-183, 2021 WL 230113, *7-8 (W.D. Mich. Jan. 22, 2021) (prisoner had no fundamental right to refuse a nasal passage test for COVID-19); *Little Rock Family Planning Servs. v. Rutledge*, 458 F. Supp. 3d 1065, 1074 (E.D. Ark. 2020) (applying *Jacobson* to uphold requirement that women obtain negative COVID-19 test before medical procedure).

[101] Moreover, as discussed above, *see* Background Section IV and Argument Section I.F., masking is *necessary* in medical settings, including the Anschutz Medical Campus, and the Denver County Public Health requires *all* people over the age of two years old in any public

### G. The Eleventh Amendment forecloses relief against the Board of Regents.

Plaintiffs assert four federal claims under 42 U.S.C. § 1983 against the Board of Regents.

But sovereign immunity under the Eleventh Amendment protects states and arms of the states

from suit in federal court. *Levy v. Kan. Dept. of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th

Cir. 2015). "This jurisdictional bar applies regardless of the nature of the relief sought."

*Pennhurst State Sch. Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). The University of Colorado,

as an arm of the state of Colorado, is entitled to Eleventh Amendment immunity. *See Rozek v.*

*Topolnicki*, 865 F.2d 1154, 1158 (10th Cir. 1989); *see also Sturdevant v. Paulsen*, 218 F.3d

1160, 1170-71 (10th Cir. 2000) (collecting cases). Likewise, the Board of Regents, as the

University's governing body, is considered a state entity entitled to Eleventh Amendment

immunity. *Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005) (unpublished); *see also*

ECF No. 1, ¶15 (describing the Board of Regents as the University's "governing body" and a

"body corporate.").[102] Because the Board is an entity considered (like the University) to be an

arm of the state, Plaintiffs' claims against the Board are barred by Eleventh Amendment

immunity.

## II. The remaining preliminary injunction factors overwhelmingly favor the University.

### A. Plaintiffs have not shown irreparable harm.

A plaintiff may suffer irreparable harm when injuries cannot be adequately remedied with

money or when complete relief cannot be granted following a final determination on the merits.

---

indoor space to wear a face covering, *regardless of vaccination status*. *See id*. Enjoining the
University's policies will not redress Plaintiffs' complaints about wearing the masks. *Id*.

[102] Plaintiffs' § 1983 claims against the Board fail for the additional reason that the Board is not a
"person" under § 1983. *See Howlett v. Rose*, 496 U.S. 356, 365 (1990) (holding that "arms of the
State . . . are not subject to suit under § 1983"); *Will v. Michigan Dept. of State Police*, 491 U.S.
58, 64 (1989).

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal citation and quotations omitted). The threatened injury "must be both certain and great," and "not be merely serious or substantial." *Id.* The only harm Plaintiffs claim is the alleged violation of their constitutional rights. Although the alleged violation of a constitutional right weighs heavily in the irreparable harm analysis, the Court "must nonetheless engage in [the] traditional equitable inquiry as to the *presence* of irreparable harm in such a context[.]" *Fish*, 840 F.3d at 752 (emphasis added). Where a plaintiff is unlikely to succeed on the merits of their constitutional claims, the court need not assume irreparable harm. *See Hobby Lobby*, 723 F.3d at 1146; *Templeton v. Anderson*, No. 12-CV-01276-RBJ-BNB, 2013 WL 1222252, *3 (D. Colo. Feb. 13, 2013), *report and recommendation adopted*, 12-CV-01276-RBJ-BNB, 2013 WL 1222111 (D. Colo. Mar. 25, 2013); *Mitchell v. Wiley*, No. CIV.A. 06-CV-00547WY, 2009 WL 900017, *3 (D. Colo. Jan. 16, 2009), *report and recommendation adopted*, CIV.A. 06-CV-00547WY, 2009 WL 900045 (D. Colo. Mar. 31, 2009); *see also Klaassen I,* 2021 WL 3073926, at *42; *Young v. James*, No. 20 CIV. 8252 (PAE), 2020 WL 6572798, *3 (S.D.N.Y. Oct. 26, 2020); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, *4 (S.D. Ohio Apr. 21, 2020).

All Plaintiffs allege violations of their constitutional right to bodily autonomy caused by being forced to get a COVID-19 Vaccine or risk expulsion. But Plaintiffs Garlick and Voelkelt face neither: Garlick has already received an exemption from vaccination; Voelkelt would receive the same exemption if only she requested it. Ex. V, at 2. While the Amended Anschutz Policy does require Dr. Fow to take the vaccine in order to complete an Anschutz graduate program in Periodontics, which requires in-person face-to-face patient care, that requirement does not violate a constitutionally protected right, therefore the Court need not presume irreparable harm. *See supra*, Argument Section I.B.2.

Plaintiffs also allege the University Policies violate their rights of free exercise, freedom from establishment of religion, and equal protection. As previously explained, these arguments are premised on the purported "denominal discrimination" Plaintiffs allege arises from the Initial Anschutz Policy's qualifying language, which is not present in either the Amended Anschutz Policy or the UCD Policy. Consequently, Plaintiffs do not face any harm to these rights either.[103] For all these reasons, Plaintiffs fail to establish irreparable harm.

### B. The balance of equities and the public interest strongly favor upholding the vaccine Policies.

The third and fourth preliminary injunction factors require the Court to 1) balance the harm to Plaintiffs of not obtaining the injunctive relief they request against the University's harm if the injunction is granted and 2) consider whether the requested relief is contrary to the public interest. *Fish*, 840 F.3d at 755-56. These two factors merge where the requested injunction is opposed by an arm of the State. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

It is hard to imagine a case where the public interest is more directly adversely impacted by the granting of the injunction than the one before the Court. For the past twenty-three months, COVID-19 has had a catastrophic impact on all aspects of life worldwide. In Colorado alone there have been more than 1,147,740 cases, 53,978 hospitalizations, and 11,087 deaths due to COVID-19.[104] Throughout the United States, over 853,230 lives have been lost,[105] millions have become ill, and millions have lost their livelihoods, with tragic consequences on their ability to keep their homes, feed their families, and pay their bills. Millions have been hospitalized,

---

[103] Again, Plaintiffs have waived any argument based on the Amended Policy. *See supra*, Argument Section I.A.2., fn. 85. Even if not waived, the policy does not violate Dr. Fow's First Amendment rights.
[104] https://covid19.colorado.gov/data, last visited Jan. 19, 2022.
[105] https://covid.cdc.gov/covid-data-tracker/#datatracker-home, last visited Jan. 19, 2022.

straining resources to their limits — including in particular and relevant part bed space and personnel resources at the Anschutz Medical Campus, as well as UCD Campus resources. Just two months ago, Colorado had the tenth highest COVID-19 hospital demand in the United States. Ex. A, ¶31. The most effective way to stop this devastation is clear: reduce the number of new infections through vaccinations so the virus cannot continue mutating in new hosts. Thus, to remain effective, any exemptions from a vaccine mandate must be extremely limited. Both campuses carefully structured their Policies with this paramount goal in mind.

Moreover, vaccination is the leading public health strategy to end the COVID-19 pandemic and to minimize the virus's adverse effects. Ex. A, ¶¶40, 43, 58, 65; Ex. J, ¶¶18-19. Transmission risk is greatest among the unvaccinated, who are much more likely to get and transmit the virus. *Id.* at ¶¶43, 54; Ex. P, ¶¶23-24. Mortality due to COVID-19 drops steeply and inversely with the vaccination rate. Ex. A, ¶42. And the evidence shows vaccines provide more robust protection than antibodies from a prior COVID-19 infection. *See id.* at ¶¶62-63; Ex. P, ¶¶67-69. No other intervention is as effective as vaccination. Ex. A, ¶¶41, 50, 58, 70; Ex. J, ¶19. During the previous Delta surge, vaccines reduced the potential for hospitalization, providing needed relief for fatigued hospital staff and preserving a minimal amount of acute and ICU bedspace. The overwhelming majority of patients hospitalized both at the Anschutz Medical Campus and elsewhere remain unvaccinated. Ex. A, ¶56; Ex. P., ¶81. And with the current rapidly escalating Omicron surge, which has yet to peak in Colorado and is more transmissible than the Delta variant, transmission risk among the unvaccinated is exponentially increased. *See* Ex. A, ¶¶19, 30, 33-34, 59; Ex. P, ¶81. Omicron is expected to increase cases and strain hospital resources even more than Delta, affecting not only those needing treatment for COVID-19, but also community members needing other emergent or serious medical treatment.

In light of that reality, Plaintiffs' refusal to receive the COVID Vaccines is not a self-contained choice that risks only their own health. *Klaassen I*, 2021 WL 3073926, at *43. And the risk to others is greatly magnified as to Dr. Fow, who requests the ability to provide treatment multiple times per week to periodontal patients, many of whom are medically vulnerable elderly persons, while he is unvaccinated and without testing to determine if he is infected, while mere inches from patients' mouths and noses, threatening those patients', and those in the community with whom those patients come in contact, health and safety. *See* Ex. B, ¶8; Ex. E, ¶15; Ex. F, ¶6; Ex. U, ¶¶7-8. Plaintiffs' broadest requested relief — for this Court to declare the Policies facially unconstitutional — would leave the University without its most effective tool to protect the community, defeating the Policies' purpose of safeguarding the community and working to end the pandemic. *Bauer v. Summey*, No. 2:21-CV-02952-DCN, 2021 WL 4900922, *19 (D.S.C. Oct. 21, 2021); *Harris v. Univ. of Massachusetts, Lowell*, No. 21-CV-11244-DJC, 2021 WL 3848012, *8 (D. Mass. Aug. 27, 2021). The paramount interest in public safety and in maintaining a functioning healthcare system tip this factor substantially against preliminary relief. *See San Diego Unif. Sch. Dist.*, 19 F.4th at 1181-82 (public's interest in preventing the spread of COVID-19 weighs "strongly" in favor of denying preliminary injunction request on religious grounds); *see also Hochul,* 17 F.4th at 295-96 (public interest outweighs plaintiffs' requests for religious exemptions from vaccine mandate for healthcare workers); *Does 1-6,* 16 F.4th at 37 ("Maine's interest in safeguarding its residents is paramount."); *Klaassen I*, 2021 WL 3073926, at *43. Therefore, Plaintiffs have failed to demonstrate an order enjoining the University from enforcing its Vaccine Policies would be in the public interest.

## CONCLUSION

For the reasons stated herein, and pursuant to the cited authorities, Defendants

respectfully request this Court deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 19th day of January, 2022.

PHILIP J. WEISER
Attorney General

*/s/ Jacquelynn Rich Fredericks*
JACQUELYNN RICH FREDERICKS*
First Assistant Attorney General
KATHLEEN SPALDING*
Senior Assistant Attorney General
MEGAN PARIS RUNDLET*
Senior Assistant Solicitor General
LAUREN DAVISON*
Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Tel: (720) 508-6171
kit.spalding@coag.gov;
jacquelynn.richfredericks@coag.gov;
megan.rundlet@coag.gov
lauren.davison@coag.gov

*Counsel of Record for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFFS'**

**MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 30)** upon all parties herein

by filing copies of same using the ECF System, this 19th day of January, 2022 addressed as

follows:

James Bopp, Jr.
Courtney Turner Milbank
Melena S. Siebert
Joseph Maughon
The Bopp Law Firm
1 S 6th Street
Terre Haute, IN 47807
jboppjr@aol.com
cmilbank@bopplaw.com
msiebert@bopplaw.com
jmaughon@bopplaw.com

*/s/ Carmen Van Pelt*