**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:22-cv-00013-RMR-STV

ANDREW GARLICK, et al.,

    Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO, et al.,

    Defendants.

---

**ORDER**

---

    Plaintiffs, students at the University of Colorado, seek to enjoin the University from enforcing the policies that it has implemented at its University of Colorado Denver ("UCD") campus and its Anschutz Medical Campus ("Anschutz") requiring students to receive vaccination against COVID-19.  Plaintiff Andrew Garlick is a junior at UCD who has a religious objection to receiving the COVID-19 vaccine.  He has applied for and received a religious exemption to UCD's vaccine requirement, and he is currently taking classes remotely.  Plaintiff Rebekah Voelkelt is a junior at UCD who also has a religious objection to receiving the COVID-19 vaccine but who has not asked for a religious exemption under UCD's policy.  Instead, she chose to withdraw from classes in August of 2021, before the UCD policy was put in place, and declined to re-enroll for classes in the spring of 2022.  Therefore, she has currently deferred her enrollment at UCD.  Plaintiff Dr. Thomas Fow is a licensed dentist and was a graduate student in the periodontics program at Anschutz.

He has a religious objection to receiving the COVID-19 vaccine and applied for, but did not receive, a religious exemption under Anschutz's policy. He has been unwillingly unenrolled from his program, but he alleges that it is unclear if he has been terminated or placed on a one-year personal leave.

On January 4, 2022, Plaintiffs filed a Complaint bringing the following claims against the University: (I) the University's policies violate their liberty interests protected by the Fourteenth Amendment, and the University's policies for granting exemptions from the vaccine requirement violate (II) the First Amendment's Establishment Clause, (III) the First Amendment's Free Exercise Clause, and (IV) the Fourteenth Amendment's Equal Protection Clause. ECF No. 1 ¶¶ 262–359. In sum, Plaintiffs allege that the University is "trying to indirectly control students' medical treatment choices and religious liberties, which it would not be allowed to do directly—by coercing students to give up their rights to bodily integrity and autonomy, and to medical treatment choice and their religious rights in exchange for the discretionary benefit of matriculating at [the University]." *Id.* ¶ 264. Plaintiffs also filed a Motion for Preliminary Injunction, ECF No. 30; *see also* ECF No. 6, seeking to enjoin the University's policies, as well as a Motion to Consolidate a hearing on the motion for preliminary injunction with a trial on the merits, ECF No. 15. The parties have briefed the motions, and they are ripe for review.

## I.      MOTION FOR PRELIMINARY INJUNCTION

### A.      Background

#### 1.      UCD Policy

UCD implemented a policy requiring its students to "submit verification of COVID-19 vaccination by the start of classes August 23, 2021 through a campus-wide platform." ECF No. 38-22 (Def. Ex. V, UCD Policy) at 1.  Under the policy, "[i]ndividuals may be exempted from the requirement to receive a COVID-19 vaccine for medical, religious, or personal reasons.  Individuals will automatically receive an exemption if submitted through the campus-wide vaccine verification portal." *Id.* at 2.  Further, "[i]ndividuals who do not provide proof of vaccination will be considered as having submitted a personal exemption and required to follow the additional safety protocols." *Id.* at 1–2.

The safety protocols for unvaccinated individuals include "wearing masks, social distancing, staying home and self-reporting when sick, quarantining in accordance with up-to-date campus policy and Centers for Disease Control ('CDC') guidance, submitting daily health attestations, and undergoing frequent asymptomatic testing."  *Id.* at 2.  "Individuals who are required to submit to ongoing asymptomatic testing will be required to do so on a weekly basis, but the frequency of testing is subject to change based on evolving medical and scientific recommendations."  *Id.* at 2 n.2.

#### 2.      Anschutz Policy

On September 1, 2021, Anschutz implemented a policy mandating vaccination against COVID-19 for "all students, faculty, and staff," and "permitting medical and religious exemptions for employees and students."  ECF No. 38-5 (Def. Ex. E, Declaration

3

of Anschutz Chancellor Donald "Don" M. Elliman, Jr.) ¶ 9.  On September 24, 2021, "[a]s infections and hospitalizations sharply rose in September 2021," the policy was revised to "require all employees and students to be fully vaccinated against COVID-19 with no exceptions other than those required by federal statute."  *Id.* ¶ 10; *see also* ECF No. 38-12 (Def. Ex. L, Amended Anschutz Policy).

The amended policy was implemented consistent with the Colorado Board of Health's rule requiring staff in healthcare facilities, including students and trainees, to be vaccinated against COVID-19, *see* 6 Colo. Code Regs. §§ 1011-1:2-12.2.1, 12.2.2(A), as well as the federal Department of Health and Human Services' ("DHHS's") interim final rule regarding vaccination against COVID-19 (the "DHHS Vaccine Mandate").  The DHHS Vaccine Mandate requires as a condition of receiving Medicare and Medicaid funding (which Anschutz accepts, *see* ECF No. 38 at 20) that hospitals must ensure all "hospital staff, who provide any care, treatment, or other services for the hospital and/or its patients," including students, are fully vaccinated against COVID-19.  42 C.F.R. § 482.42(g)(1)(iii); 86 Fed. Reg. 61555–61619 (2021).  The DHHS Vaccine Mandate also requires facilities to include a process "by which staff may request an exemption from the staff COVID-19 vaccination requirements based on an applicable Federal law."  42 C.F.R. § 482.42(g)(3)(vi).  The Supreme Court recently upheld the DHHS Vaccine Mandate in *Biden v. Missouri*, 142 S. Ct. 647, 653 (2022), holding that "the Secretary [of Health and Human Services] did not exceed his statutory authority in requiring that, in order to remain eligible for Medicare and Medicaid dollars, the facilities covered by the interim rule must ensure that their employees be vaccinated against COVID-19."

4

The Anschutz policy, as amended on September 24, 2021 ("Amended Anschutz Policy"), requires all individuals "who are, or may access any University facility or participate in any University program, or whose employment or academic activities may require in-person interaction with other CU Anschutz employees, students, patients, [etc.] . . . , must be fully vaccinated against COVID-19 unless they have received an approved medical or religious accommodation." ECF No. 38-12 (Def. Ex. L) at 2. The Amended Anschutz Policy provides for religious and medical accommodations for employees, but "[r]eligious accommodations are not currently available to students." *Id.* Defendants point out that Title VII requires religious accommodations for employees only, but it does not apply to students. *See* 42 U.S.C. § 2000e-2(a)–(b); ECF No. 38 at 21, 21 n.75; ECF No. 38-5 (Def. Ex. E) ¶ 11; *see also* 42 C.F.R. § 482.42(g)(3)(vi) (the DHHS Vaccine Mandate, only requiring facilities to provide a process to "request an exemption . . . based on *an applicable Federal law*") (emphasis added).

The Amended Anschutz Policy further provides that "[i]ndividuals who are not vaccinated and do not have an approved medical or religious accommodation, will not be allowed to access University facilities or programs in person." ECF No. 38-12 (Def. Ex. L) at 4. Also, "[u]nvaccinated students who fail to submit verification of vaccination or comply with required safety protocols for accommodated individuals may be referred to their respective School/College/program for potential action and/or discipline, up to and including termination from the program." *Id.*

5

B.   **Legal Standards**

1.   **Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)).

> To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

*Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)); *accord Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian*, 958 F.3d at 978 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

"It is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman*, 348 F.3d at 1188–89. However, "courts 'disfavor' some preliminary injunctions and so require more of the parties who request them." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that

6

the moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors"—the movant must make a "strong showing" that these factors tilt in his or her favor. *Id.* Plaintiffs here seek declaratory and injunctive relief, and issuing their requested preliminary injunction would essentially grant them all the relief they could expect to win at trial. *See* ECF No. 1 ¶¶ 360–65. They must, therefore, make a strong showing on the likelihood-of-success-on-the-merits and balance-of-harms factors to succeed in their preliminary injunction motion.[1]

### 2. Standing

Article III of the United States Constitution gives federal courts the power to decide only "cases" or "controversies." U.S. Const. art. III, § 2. The jurisdictional doctrine of standing, like the doctrines of ripeness and mootness, serves to "keep federal courts within their constitutional bounds." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019). "The constitutional requirements for standing are (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1214–15 (10th Cir. 2017); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each

---

[1] Defendants argue that Plaintiffs' requested injunction is also disfavored because it would "mandate action" and "change the status quo." ECF No. 38 at 27. Having already found that a heightened standard applies, the Court need not address these additional types of disfavored preliminary injunctions.

7

element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

### C.     Analysis

For the reasons stated below, Plaintiffs have failed to carry their burden to establish that each of the factors for granting a preliminary injunction tips in their favor. In particular, Plaintiffs have failed to make a strong showing that they are likely to have standing to succeed on the merits of their claims; they have failed to demonstrate that they will be irreparably harmed absent injunctive relief; and they have failed to make a strong showing that the balance of the harms and the public interest weigh in their favor.

#### 1.     Substantial Likelihood of Success on the Merits

Because Plaintiffs likely do not have standing, they are unlikely to succeed on the merits of their claims. As noted above, "[t]he constitutional requirements for standing are (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision." *New Mexico*, 854 F.3d at 1214–15; *see also Lujan*, 504 U.S. at 560–61. Plaintiffs Garlick and Voelkelt, and likely Plaintiff Fow, have not established that they have suffered an "injury in fact." Further, Plaintiff Fow has not established the requisite causal connection between his injury and the policy he seeks to enjoin or that his alleged injury is redressable through Court action.

### a. Plaintiffs Garlick and Voelkelt

Plaintiffs Mr. Garlick and Ms. Voelkelt have not established that they have suffered an injury in fact as a result of the UCD policy. In determining whether a party has established an injury in fact, courts assess whether the alleged injury falls within the "zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982).

Here, Mr. Garlick has been granted a religious exemption from receiving the vaccine. ECF No. 1 ¶ 218–19. Therefore, he has not suffered an injury in fact. As for Ms. Voelkelt, the UCD policy provides that she would automatically receive a religious exemption if she ever sought one. *See* ECF No. 38-22 (Def. Ex. V) at 2. However, she never applied for a religious exemption and instead chose to voluntarily withdraw from her classes the day before the UCD policy went into effect and to decline to re-enroll in classes the following semester. ECF No. 1 ¶ 252; ECF No. 38-24 (Def. Ex. X, Declaration of Carrie John, MA, UCD Associate Vice Chancellor for Enrollment and Academic Services) ¶ 28. The doctrine of standing does not recognize a cognizable injury where the harm is self-inflicted based on a fear of future harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

Further, Ms. Voelkelt argues that she may have to re-apply to re-enroll in the future, or that she might lose her scholarship, if she continues to defer enrollment beyond the

9

time[2] that the University will allow her to remain an "active" student in its system while deferring enrollment. *See* ECF No. 1 ¶¶ 253–55. However, this argument assumes that the pandemic and the University's policies regarding it will remain the same in the coming year or longer, and such speculative future harm is also not sufficient for purposes of standing.[3] *See Clapper*, 568 U.S. at 410–11, 414; *see also Lujan*, 504 U.S. at 560 (the injury in fact must be "actual or imminent, not conjectural or hypothetical") (internal quotations and citations omitted). Finally, to the extent Ms. Voelkelt argues that she is injured by being required to report her vaccination status to the University, *see* ECF No. 1 ¶ 252, the policy presumes that she qualifies for an exemption if she has not presented proof of vaccination, so Ms. Voelkelt is not injured if she does not report her vaccination status. *See* ECF No. 38-22 (Def. Ex. V) at 2.

To the extent either Mr. Garlick or Ms. Voelkelt argues that, even with a religious exemption, he or she is being coerced to forego his or her constitutional right to bodily autonomy and free exercise of religion by being required to either undergo regular COVID testing, wear masks and practice social distancing, or participate in education online, ECF No. 1 ¶ 2 n.1, Plaintiffs have not alleged that these requirements violate their right to bodily autonomy or free exercise of religion. They have only alleged religious and bodily autonomy objections regarding the vaccine, itself. *Id.* ¶¶ 213–18, 249–52.

---

[2] Ms. Voelkelt alleges that she may "remain active in the [University] system for three semesters. If she is not re-enrolled for the fall 2022 semester, [the University] will consider her inactive and she would need to re-apply and be re-admitted." ECF No. 1 ¶ 253. However, Defendants contend that "she will remain an active UCD student so long as she reenrolls by Spring 2023." ECF No. 38 at 30 n.83.

[3] The harm of the loss of Ms. Voelkelt's scholarship also would not suffice for the Court to grant a preliminary injunction because the irreparable harm must be one that is not compensable by money damages. *See Schrier*, 427 F.3d at 1267.

Plaintiffs argue that the safety requirements, including testing, harm them because they are "forced to take time out of their week to go and get tested." ECF No. 39 at 8. However, neither Mr. Garlick nor Ms. Voelkelt has alleged that they are currently required to get tested because Mr. Garlick is learning remotely and Ms. Voelkelt is not enrolled at the University.[4] *See Clapper*, 568 U.S. at 410–11, 414 (speculative harm is insufficient to confer standing); *see also Lujan*, 504 U.S. at 560 (the injury must be "actual or imminent, not conjectural or hypothetical"). Moreover, given that the Constitution does not specifically protect the right to engage in education, *see San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973), the right to engage in education in a certain format—in-person as opposed to virtually—in order to engage in networking and social learning, as Plaintiff Garlick would prefer, ECF No. 1 ¶¶ 220–26, 228, is certainly not protected. Therefore, the ability to attend in-person classes does not fall within the "zone of interests to be protected . . . by the constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475.

### b. Plaintiff Fow

Dr. Fow alleges that on September 9, 2021, he received a rejection of his application for a religious exemption to the Anschutz vaccine policy and that he subsequently was informed that he was no longer allowed to access the campus. ECF No. 1 ¶¶ 238–44. On September 24, 2021, he received an email from the Dean of the

---

[4] Ms. Voelkelt also argues that having to comply with these safety requirements would "subject her to harassment, bullying, and targeting." ECF No. 39 at 9 n.9. However, again, such harm is merely speculative and not sufficient to confer standing. *See Clapper*, 568 U.S. at 410–11, 414; *Lujan*, 504 U.S. at 560.

School of Dental Medicine stating that the Dean "concurr[ed] with" the recommendation of the School of Dental Medicine Student Performance Committee that Dr. Fow be "put on a leave of absence in the event [he] chose not to be vaccinated" and that "[i]f by Tuesday, September 28, 2021, [he] ha[d] not shared evidence of vaccination with a first dose of the COVID-19 vaccination, [he] w[ould] be disenrolled from all School of Dental Medicine course work in the Graduate Periodontics program, and patient care." *Id.* ¶ 244. Based on these communications, Dr. Fow concedes that he "is unclear whether he has been disenrolled from the school or is on a one-year personal leave." *Id.* ¶¶ 243–47; *see also* ECF No. 30 at 40. Therefore, any argument that Dr. Fow is being injured by being permanently terminated from the program is merely speculative and is not sufficient to confer Article III standing. *See Clapper*, 568 U.S. at 410–11, 414; *Lujan*, 504 U.S. at 560.

Even if Dr. Fow could otherwise demonstrate an injury in fact to establish standing, he has not demonstrated the requisite causal connection between his alleged injury and the Anschutz policy or the redressability of his alleged injury by this Court. The University put the Anschutz policy in place pursuant to federal regulations that the Supreme Court has upheld, *see Biden*, 142 S. Ct. at 653, as well as Colorado state regulations. No such governmental entities are named in this action. "[T]here is no traceability if the plaintiff's injury is 'the result of the independent action of some third party not before the court.'" *Lawrence v. Polis*, 505 F. Supp. 3d 1136, 1149 (D. Colo. 2020) (Domenico, J.) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)); *see also Clapper*, 568 U.S. at 414; *Lujan*, 504 U.S. at 560. Further, the alleged harm is not redressable by this Court where the

Anschutz policy follows valid federal and state regulations that have been upheld by the Supreme Court.  *See Biden*, 142 S. Ct. at 654–55.

      **2.**      **Irreparable Harm**

Even if Plaintiffs could demonstrate a cognizable injury in order to establish standing, they have not borne the burden of establishing that such injury constitutes irreparable harm that entitles them to preliminary injunctive relief.  "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Id.* (internal quotations and citation omitted).  The threatened injury "must be both certain and great," and "not be merely serious or substantial."  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

In their briefing on their motion for a preliminary injunction, Plaintiffs argue that because they have established a constitutional harm, the law presumes irreparable harm.  *See* ECF No. 30 at 86; ECF No. 39 at 39–40.  However, for the reasons stated above, the Court finds that Plaintiffs have failed to establish standing to bring their constitutional claims.  For similar reasons, they have further failed to demonstrate the irreparable harm factor for granting a preliminary injunction.  Even where there are allegations of constitutional violations, the Court "must nonetheless engage in [its] traditional equitable inquiry as to the presence of irreparable harm."  *Fish v. Kobach*, 840 F.3d 710, 752 (10th

Cir. 2016). The Court finds that each Plaintiff here has not suffered an irreparable harm that would justify granting the relief sought.

Mr. Garlick's alleged harm is that "his only option to continue his education [is] to participate in a fully online program" and that this causes him to "miss[] the social interaction associated with in-person learning" and ability "to take advantage of certain classes and experiences available in-person." ECF No. 30 at 38. As noted above, the Constitution does not guarantee Plaintiffs the right to public education, much less to public education in a certain format or that provides a particular social or networking benefit. *See San Antonio Indep. Sch. Dist.*, 411 U.S. at 35. Mr. Garlick is still accessing his education through UCD, and the Court finds that he is not irreparably harmed absent a preliminary injunction.

Ms. Voelkelt alleges she would be harmed, first, "because the exemption required the disclosure of her private information, she felt that her only option was to defer her education for the year." ECF No. 30 at 41. However, in this context, "[a] delay in collegiate or graduate education isn't typically irreparable harm." *Klaassen v. Trs. of Ind. Univ.*, No. 1:21-CV-238 DRL, 2021 WL 3073926, at *41 (N.D. Ind. July 18, 2021) (not yet reported) (collecting cases). To the extent Ms. Voelkelt also argues that she would be harmed by being subjected to the extra safety protocols imposed on non-vaccinated individuals by the UCD policy if she were to continue her education, she voluntarily dropped her courses on August 22, 2021, the day before the UCD policy went into effect on August 23, 2021, and has not re-enrolled. ECF No. 38 at 23; ECF No. 38-24 (Def. Ex. X) ¶ 28; ECF No. 38-22 (Def. Ex. V) at 1. Therefore, the harms that Ms. Voelkelt alleges she would suffer

14

from complying with the UCD safety protocols, including testing, if she re-enrolls, are merely hypothetical and not "certain and great." See *Pierce*, 253 F.3d at 1250; *see also Klaassen*, 2021 WL 3073926, at *42 ("Though some students say the extra requirements [regarding COVID testing] are unnecessary or inconvenient, neither concern rises to the level of irreparable harm.").

Finally, Dr. Fow alleges that he was terminated on September 28, 2021 for failing to receive the COVID vaccine after being denied a religious exemption. ECF No. 30 at 39–40. However, as discussed above, he alleges that he "is unclear whether he has been disenrolled from the school or is on a one-year personal leave." *Id.* at 40 (citing ECF No. 1 ¶¶ 243–47). Given the speculative nature of Dr. Fow's leave from the program, his harm is also not "certain and great," *see Pierce*, 253 F.3d at 1250. Moreover, as stated, "[a] delay in collegiate or graduate education isn't typically irreparable harm." *Klaassen*, 2021 WL 3073926, at *41. Further, education is not a protected constitutional right, and without an infringement of a constitutional right, irreparable harm need not be presumed. *See San Antonio Indep. Sch. Dist.*, 411 U.S. at 35; *see Fish*, 840 F.3d at 752.

### 3. Balance of the Harms and the Public Interest

Finally, even if Plaintiffs had met every other factor for granting a preliminary injunction, they would still fail to bear their burden to make a strong showing that the balance of the harms and the public interest weigh in favor of granting the relief sought. As noted above, these factors "'merge' when, like here, the government is the opposing party." *Aposhian*, 958 F.3d at 978 (citing *Nken*, 556 U.S. at 435); *see also Heideman*, 348 F.3d at 1188.

15

Plaintiffs argue that the University "will experience no harm if the mandate is enjoined" because (1) "vaccines do not stop transmission so the [policies are] not promoting public health"; (2) the University "has already reached herd immunity"; (3) the University "already allows exemptions for certain persons, so allowing additional persons to attend without the vaccine would not harm" the University; and (4) "the public can protect themselves from the COVID virus by voluntary vaccination, social distancing, and masking." ECF No. 30 at 86–87; *see also* ECF No. 39 at 40–41. These internally inconsistent arguments[5] do not demonstrate that the balance of the harms and the public interest weigh in Plaintiffs' favor.

Defendants have provided declarations from witnesses who are involved in the policy-making process of the University, including University officials who are physicians, professors of medicine, and dentists, who attest to the importance of the University's policies in minimizing the adverse effects of COVID-19 in the University and the community. *See, e.g.*, ECF No. 38-1 (Def. Ex. A, Declaration of Jonathan "Jon" M. Samet, MD, MS) ¶ 83 ("If we are to have the safest possible classrooms, offices, laboratories, and clinics and hospitals, there is no alternative to vaccination."); *see also, e.g.*, ECF No. 38-5 (Def. Ex. E) ¶ 15; ECF No. 38-10 (Def. Ex. J, Declaration of Matthew K. Wynia, MD, MPH, FACP) ¶¶ 18–19; ECF No. 38-16 (Def. Ex. P, Declaration of Thomas Campbell,

---

[5] Plaintiffs appear to argue simultaneously that policies requiring vaccination do not promote public health because they do not stop transmission and that the University "can decrease 'the risk of transmission' by simply encouraging individuals to get the vaccine." ECF No. 30 at 86–87; ECF No. 39 at 40–41. The Court finds these arguments contradictory.

In addition, the argument that the University already allows for vaccine exemptions, so allowing additional people to attend without vaccination would not harm the University, ECF No. 30 at 87, ignores the fact that Plaintiffs Voelkelt and Garlick already can attend in person without vaccination if they comply with UCD's safety protocols.

M.D., MS) ¶ 86; ECF No. 38-21 (Def. Ex. U, Declaration of Denise K. Kassebaum, DDS, MS) ¶¶ 7–9.  Citing these declarations, Defendants argue that enjoining or declaring unconstitutional the University's policies "would leave the University without its most effective tool to protect the community, defeating the Policies' purpose of safeguarding the community and working to end the pandemic."  ECF No. 38 at 64.  Furthermore, as discussed above, Anschutz implemented its policy in accordance with the rules of the Colorado Board of Health, as well as federal regulations that the Supreme Court has upheld.  *See Biden*, 142 S. Ct. at 653.  Therefore, the Anschutz policy is consistent with both state and federal regulations.  With respect to the Anschutz policy, in particular, the Supreme Court observed in *Biden v. Missouri* that:

> [E]nsuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm.  It would be the "very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID-19."

142 S. Ct. at 652 (quoting *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021)).  The Court declines to substitute its judgment for that of state and federal policy makers and the University, as Plaintiffs ask it to do in requesting preliminary injunctive relief.  *See, e.g.*, *Klaassen*, 2021 WL 3073926, at *43 ("The court isn't a policymaker: that role is left to the States.").

For these reasons, this Court joins numerous other courts in holding that the public interest and the balance of the harms weigh against enjoining policies requiring either vaccination against COVID-19 or compliance with other safety measures.  *See, e.g.*, *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1181–82 (9th Cir. 2021) (quoting *Prince*

17

*v. Massachusetts*, 321 U.S. 158, 166–67 (1944)) ("[A]s the Supreme Court has long recognized, 'the right to practice religion freely' is not 'beyond regulation in the public interest,' including regulation aimed at reducing the risk of 'expos[ing] the community or the child to communicable disease.'"); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("[T]he State has an indisputably compelling interest in ensuring that the employees who care for hospital patients . . . and other medically vulnerable people in its healthcare facilities are vaccinated against COVID-19."); *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) ("Maine's interest in safeguarding its residents is paramount.").

## II. MOTION TO CONSOLIDATE

In addition to their Motion for Preliminary Injunction, Plaintiffs filed a Motion to Consolidate the hearing on their Motion for Preliminary Injunction with the trial on the merits of this case. ECF No. 15. Defendants do not oppose such consolidation and propose a schedule for the completion of depositions and supplemental briefing. ECF No. 37 at 1–2. However, having reviewed the parties' briefing and exhibits, the Court concludes that a hearing on the merits of the motion for preliminary injunction is unnecessary to rule on Plaintiffs' Motion for Preliminary Injunction. For the reasons stated above, the papers show that Plaintiffs have failed to carry their burden to establish that the factors for granting a preliminary injunction have been met.

### III. CONCLUSION

The Court DENIES Plaintiffs' Motion for Preliminary Injunction, ECF No. 30, and Plaintiffs' Motion to Consolidate, ECF No. 15.

DATED: January 25, 2022

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge